## KORN AND WISEMILLER v. THE MUTUAL ASSURANCE SOCIETY AGAINST FIRE ON BUILDINGS OF THE STATE OF VIRGINIA.

The separation of Alexandria from Virginia did not affect existing contracts between individuals. The insurance upon buildings in Alexandria did not cease by the separation, although the company could only insure houses in Virginia. The obligation of the *insured* to contribute, does not cease in consequence of his forfeiture of his own insurance by his own neglect. All the members of the company are bound by the act of the majority. No member can

ERROR to the circuit court of the district of Columbia, sitting at Alexandria.

This was a motion, in the court below, in the name of the principal agent of the Mutual Assurance Society for judgment against *Korn & Wisemiller* for 116 dollars, " being the amount due from them for a *half quota* under a declaration for insurance made to the society with 6 *per cent.* interest thereon from the 1st day of June, 1805."

The court below gave judgment according to the motion, and the defendants brought their writ of error.

This society was incorporated by the legislature of Virginia, by an act passed on the 22d of December, 1794, entitled " An act for establishing a Mutual Assurance Society against fire on buildings in this state."

The principles of the society are declared to be, " That the citizens of this state may insure their buildings against the losses and damages occasioned accidentally by fire; and that the *insured* pay the losses and expenses, each his share according to the sum insured."

The act provides that the *rules and regulations* which should be concluded upon by a majority of the subscribers at the first meeting, should be binding on all those who should insure their property in that society; and that a majority of the society might at any time alter and amend the rules and regulations as they should judge necessary. That certain premiums should be agreed upon to be paid by the insured to constitute a fund to pay losses. And that if that fund should not be sufficient, a " *repartition*" among the insured should be made, and each should pay on demand of the cashier his share according to the sum insured and the rate of hazard. It also provides that the property insured should be bound for the payment, and for that purpose might be sold. That such *quotas* when called for should be advertised, and when any person should neglect to pay his *quota, his insurance should cease until it should be paid.* If the property should be sold, the purchaser was to become a subscriber in lieu of the vendor. The subscribers might be compelled to pay the premiums, on request of the cashier, with 6 *per cent.* interest to the day of payment.

By a subsequent act, passed in December, 1795, it was enacted, " That the said subscribers, a majority of them in person or by deputation being present, or a majority of the sum subscribed, when any meeting shall be held, being there represented, shall have power and authority to proceed and act in *all matters and things* in the first recited act mentioned, in as full, absolute, and unlimited a manner as they might or could do if all and every of the said subscribers were actually present and attending at any such meeting."

By an act passed the 12th of January, 1799, it is enacted, " That the said mutual insurance society shall have full power to recover the whole, or any part of such premiums or quotas as are, or may hereafter become, due from any delinquent subscriber or member, under his subscription or declaration for insurance made to the said society, on motion of the cashier of the society before the court of the county, or the court of the district wherein such delinquent may reside, ten

*Margin note:* Korn v. Mu. As. So. — devest himself of his obligations as such, but according to the rules of the society.

days' notice of such motion being previously given; and each court shall have full jurisdiction to hear and determine such motion, and to cause their judgment to be enforced with costs by any legal executions; saving to any person, against whom a motion shall be made, the right of a trial by jury, if he shall desire it."

By an act passed the 27th of January, 1803, it is enacted, "That the said society may insure buildings in the county of Alexandria, provided congress shall pass a law subjecting those who declare for insurance in that society to the provisions and regulations of the laws of Virginia, which are already, or may hereafter be, passed concerning the said society. The act to commence and be in force as soon as congress shall pass a law subjecting the citizens of the county of Alexandria who shall *hereafter* subscribe for insurance in the said society, to the same mode of recovery in the court of the county of Alexandria as is now allowed and granted by the laws of this commonwealth against defaulting subscribers residing within this state."

On the 3d of March, 1803, congress passed such an act as was contemplated by the legislature of Virginia.

On the 29th of January, 1805, Virginia passed an act, the preamble to which recites, that it had been represented on the part of the society that such a change in their constitution as would separate the interests of the inhabitants of the *towns* from the interests of the inhabitants of the *country*, is essential to the "*equalization*" of the risks, and that the same had been agreed upon at a general annual meeting of the society. It therefore enacts, that the funds should be divided between the towns and the country, in proportion to the capital subscribed by the towns and country respectively, and, that the town funds should be only liable for town losses, and country funds for country losses. That during the year 1805, all the valuations of houses insured should be revised, and no loss paid but according to such revaluation subject to a deduction of one fifth thereof; "and *where such revaluation shall exceed the former valuation, an additional premium shall be paid.*"

That " it shall be lawful for any member of this society to *withdraw* from the same, on giving six weeks' previous notice, and upon paying all arrearages due at the time of withdrawing."

" That all debts due, or to become due, to the society may be sued for, prosecuted, and recovered in the *name of the society* in the same manner, in the same courts, and upon the same principles, as they may now be sued for, &c. except that the name of the *cashier* need not be used. That the agents, &c. shall perform the duties required from agents by the 19*th article* of the rules and regulations now in force."

By the 19th article of the rules and regulations of the society adopted and in force prior to the 29th of January, 1805, the duties of an agent were " to act for the society agreeably to the constitution, to apply to the houseowners of their respective counties, explain the plan to them, make out the declarations of insurance, procure the certificate of the majority of three respectable houseowners (of whom the county agent may be one) of the valuation of the buildings, transmit the declarations, properly executed, to the principal agent, and correspond with him on what may be necessary to be done."

The plaintiffs in error made their declaration for insurance in the usual form under seal, and thereby promised that they would " abide by, observe and adhere to the constitution, rules and regulations which were already established, or might thereafter be established, by a majority of the assured present in person, or by representatives, or by a majority of the property insured, represented either by the persons themselves, or their proxy, duly authorized, or their deputy, as established by law, at any general meeting to be holden by the assurance society, or which were, or thereafter might be, established by the president and directors of the society."

In consequence of this declaration, the plaintiffs in error paid the original premium of insurance and ob-

tained a policy. The society demanded a *half quota* *that is to say, for the payment as it existed on the 25th of February, 1805, of a sum equal to one half of the original premium, which half quota was required to be paid on the 1st of April, 1805, and is the sum for which judgment is now claimed."*

By the 14th article of the original rules and regulations of the society, it is provided, that, " In every period of seven years from the commencement of this institution, there shall be new declarations and valuations for insurance upon buildings insured by this society, and whoever fails to renew his declarations and valuations for the space of three months from the expiration of each term of seven years, shall cease to enjoy the benefits of his assurance till such new declarations are made; should the valuation be less than before, the assured shall have no right to demand of the society the difference of the premiums, but it shall remain for the benefit of the society, and in case of any loss the insured are always to be paid according to the last valuation."

*Korn & Wisemiller* did not, within three months after the expiration of the first term of seven years, renew their declaration and valuation, and thereby ceased to enjoy the benefit of their insurance.

The town and county of Alexandria, in which these buildings were situated was, until the 27th of February, 1801, a part of the state of Virginia, since which day they have constituted a part of the district of Columbia. The plaintiffs have always been inhabitants of the town of Alexandria ever since the year 1789.

On the 25th of December, 1795, the society commenced the operations of the institution.

In pursuance of the act of Virginia of the 29th of January, 1805, a separation of the interests of the inhabitants of the *towns* from the interests of the inhabitants of the *country*, has been made in the manner expressed in the 1st, 2d, 3d, 4th, 5th, and 6th sections.

The new constitution in that act contained, went into operation on the 30th of January, 1805.

The plaintiffs in error made a declaration of *revaluation* of the property insured by them, which declaration was under their seals, and was produced and made in consequence of the representations of the agent of the society, who stated that the plaintiffs in error, were bound by their former declaration, and by the rules and regulations of the society, so to do.

*C. Lee*, for the plaintiffs in error, contended,

1. That they were not members of the company on the 25th of February, 1805, when the demand was made.

By the cession of the district of Columbia to the United States, the town of Alexandria ceased to be in Virginia, so that the plaintiffs in error were not Virginians, nor was their property in Virginia, and one of the fundamental articles of the charter would thus be violated if the property should continue to be insured.

By accepting the new charter the old was dissolved, and no person could be a member of the new company unless by a new declaration, and by accepting a new policy.

2. That the revaluation, and new declaration did not bind the plaintiffs in error, because it was made under a misrepresentation made by the agent of the society; and it is immaterial whether it were a misrepresentation as to the fact or as to the law.

By the charter the *assured* only were to be considered as members of the company. When a person ceased to be *assured* he ceased to be a member, and was no longer liable to new calls. If the property of *Korn & Wisemiller* had been destroyed by fire after the 27th of February, 1801, (the day of the separation of Alexandria from Virginia,) the society would not have been liable; *Korn & Wisemiller*, therefore, cannot be liable for a share of the losses which have happened

since that time. It was a fundamental principle of the charter, that the insurance should be mutual.

The act of congress of the 27th of February, 1801, which adopts the laws of Virginia as the laws of that part of the district of Columbia; does not aid the society, for the law of Virginia authorized insurance to be made upon houses in Virginia only. Any person might withdraw from the company by refusing to pay a quota, or by refusing to accept a policy.

*Swann,* contra.

The original charter gave the majority of the members a right to bind the residue, as well by alterations in the charter itself, as by rules, by-laws and regulations; a majority could accept a *new* charter, and thereby bind all the members.

The cession of the district of Columbia did not destroy private rights; it only changed the political relation of the inhabitants.

No person could withdraw from the company otherwise than by the mode pointed out in the act of Virginia, after giving the notice prescribed. The suspension of the insurance of a person refusing or neglecting to pay his quota, is a mere penalty, he does not cease to be a member, he still remains liable for his share of the losses, notwithstanding the suspension of his own insurance.

If there was a misrepresentation by the agent of the society, it was a misrepresentation of a principle of law which the plaintiffs in error were bound to know as well as the agent. They were members of the company, and ought to have known all the obligations they contracted as such. *Fonb. Eq.* 108. *Doct. & Stud.* 1. 46. 309. *Woodd.* 608. *Buller,* 31.

JOHNSON, J. delivered the opinion of the court as follows:

This cause comes up from the circuit court of Alex-

andria, in which a summary judgment has been given for the recovery of a contribution demanded of the members of the mutual assurance society conformably to its by-laws.

The plaintiffs here contest their liability upon several grounds.

1. Because, by the separation of Alexandria from the state of Virginia, they virtually ceased to be members of the institution.

2. That, by having omitted to revalue within seven years, they were no longer insured, and, of consequence, not liable to contribute.

3. That, by the alteration of the charter in 1805, their security and liability became so materially changed, as to discharge them from their contract.

4. That their revaluation in 1805 ought not to be obligatory upon them, because they were deluded into it by false or incorrect suggestions.

5. That they are not liable, under the description of persons who had insured prior to 1804, as they ought to be considered only as having insured at the time of their revaluation.

On the first of these points, the court are of opinion, that the separation of Alexandria from the state of Virginia could have no effect upon existing contracts of individuals. Such divisions of territory are entirely political; a separation of jurisdiction takes place, but private interests and private contracts remain unaffected, and every individual relation continues the same, except that of being associated under the same government. The circumstance, that the law of Virginia, has limited the company to the bounds of the state, in performing its functions, could only prevent them from making new contracts subsequent to the separation, and until they had received additional powers,

but could not release them from their liability to individuals with whom they had previously contracted. Nor can the circumstance of the members of the legislature being authorized to represent their respective counties, affect the case; for, although the Alexandria property could no longer be represented in that mode, there was nothing to prevent their appearing in person, or by proxy, at the meetings of the company.

The court are further of opinion, that all the other grounds assumed by the plaintiffs are equally untenable. Although, at the first view, it would appear reasonable that he who is not insured is not bound to contribute, yet there may exist strong reasons why, under the peculiar organization of this company, a different rule should be adopted; and certain it is that the individual may, by his own act, subject himself to such a state of things. The liability of the members of this institution is of a twofold nature. It results both from an obligation to conform to the laws of their own making, as members of the body politic, and from a particular assumption or declaration which every individual signs on becoming a member. The latter is remarkably comprehensive. " We will abide by, observe and adhere to the constitution, rules and regulations which are already established, or may hereafter be established, by a majority of the insured present in person, or by representatives, or by the majority of the property insured, represented either by the persons themselves, or their proxy, duly authorized, or their deputy, as established by law, at any general meeting to be held by the said assurance society, or which are, or may hereafter be, established by the president and directors of the society." It would be difficult to find words of more extensive signification than these, or better calculated to aid, explain and enforce the general principle, that the majority of a corporate body must have power to bind its individuals. It is true that the words of this declaration, as well as the general power of a corporate body, must be restricted by the nature and object of its institution; but apply this rule to the case before us, and it cannot avail the plaintiffs, for both the rule which suspends the secu-

rity and the alteration made in its constitution, under a
vote of the majority, are strictly conformable to the
general objects for which the company was insti-
tuted.

We are of opinion that whilst Korn & Wisemiller
continued members of the society, they remain sub-
ject to the general liability which that state imposes;
and that, after becoming members, their ceasing to be
so must be determined by the rules of the society,
which rules, as far as we are at present advised, admit
of only two cases; one is, where the house insured is
consumed by fire, and the other, upon giving the
notice, and conforming to the other regulations im-
posed by the by-laws.

It is observable that the rule which imposes the ne-
cessity of a septennial valuation of the property insu-
red, does not contemplate a total rescission or annihila-
tion of the contract; on the contrary, it is express in
declaring that, upon a revaluation being made, the
party shall continue insured by virtue of his former
policy. We, therefore, consider this suspension of his
security merely as a penalty imposed upon the member
for neglecting to conform to a rule of the society.
And it is certainly much more reasonable that he
should be subject to a loss or inconvenience for his own
neglect, than that he should be released from his lia-
bility to the society, in consequence of it.

As to what is contended to be a material alteration
in their charter, we consider it merely as a new ar-
rangement or distribution of their funds and whether
just or unjust, reasonable or unreasonable, beneficial
or otherwise, to all concerned, was certainly a mere
matter of speculation, proper for the consideration of
the society, and which no individual is at liberty to
complain of, as he is bound to consider it as his own
individual act. Every member, in fact, stands in the
peculiar situation of being party of both sides, insurer
and insured. Certainly the general submission which
they have signed will cover their liability to submit to
this alteration.

Korn
v
Mu, As. So.

The view which we have taken of this subject affords an answer to the fifth ground, and, in a great measure, to the fourth.

We consider the insured, upon every revaluation, as in under his former right of membership, and, of consequence, that the plaintiffs come under the description of persons who had insured before 1804; and, for the same reason, the representation of Scot (could any effect at all be given to the circumstances to which he testifies) was true, as to the membership of the plaintiffs, and as to their liability in that capacity. They must have known it was a question of law, on which Scot possessed no power to commit the society, and on which the plaintiffs themselves ought to have been as well informed as any other individual.

Judgment affirmed.