[Supreme Commandery Knights Golden Rule v. Ainsworth.]

ful currency of the country. The measure of damages is not the consideration, which is paid by way of compromise or concession, but the value of the property to be delivered, or right to be enjoyed, because "this is the remuneration fixed by agreement."—1 Sedgw. on Dam. 203. Mere inadequacy of consideration is no objection to a plaintiff's right of recovery upon a contract. The valuation placed by the parties upon the scholarship was evidently in good money, the right to the payment of which was waived and lost by the defendant's voluntary acceptance of a depreciated currency.

There are some analogies strongly favoring the measure of damages adopted by the Circuit Court, which seems to have been the annual value of tuition from the date of the the breach to the day of the trial. The objections to it, however, are its fluctuating uncertainty, increasing in amount with the protraction of the litigation, and its speculative nature in assuming that the plaintiff would always be punctually ready to claim the benefit of his scholarship, with every and each succeeding year. The charge of the court, in this particular, was more favorable to the appellant than the law, in our view, authorized.

We discover no error in the rulings of the court, which could have been prejudicial to appellant, and the judgment must be affirmed.

# Supreme Commandery of the Knights of the Golden Rule *v.* Ainsworth.

*Action for Benefit Certificate issued by the Supreme Commandery of the Knights of the Golden Rule.*

1. *Supreme Commandery of the Knights of the Golden Rule, a mutual life insurance company, and its certificate, entitled " Knight's Benefit Certificate," a contract of insurance.*—The Supreme Commandery of the Knights of the Golden Rule, a corporation created and organized under the laws of the State of Kentucky, is, in contemplation of law, a mutual life insurance company; and a certificate issued by that corporation, entitled a "Knight's Benefit Certificate," by which the corporation promises to pay a specified amount to the widow of the holder of the certificate, on his death, in consideration of his having become a member of the order, and having paid the fee for admission to membership, and of his payment in the future of all assessments levied and required by the corporation, on condition that he remained a member of the order, in good standing, and complied with all its laws then of force, or subsequently enacted,—has all the essential elements of a contract of life insurance by a mutual insurance company with one of its members.

[Supreme Commandery Knights Golden Rule v. Ainsworth.]

2. *Same; when a subsequent by-law providing a forfeiture of certificate made a part of contract.*—Where such certificate is silent as to the conse-quence, if the holder should die by his own hand, but recites that any violation of the "requirements of the laws now in force, or hereafter en-acted, governing the order, or this class, shall render this certificate null and void," and that a condition upon which its obligation depends, is "the full compliance with all the laws of the order now in force, or that may hereafter be enacted;" and it was issued, and was accepted by the assured in writing, "subject to the laws of the order now in force, or which may hereafter be enacted by the Supreme Commandery;" and, at the time it was issued, there was a general law of the corporation, ren-dering it a condition upon which a certificate could issue, and upon which its benefits could be realized, that the member to whom, or upon whose life it was issued, should comply with the "general laws of the order then in existence, or which might thereafter be enacted;" but the by-laws contained no provision declaring an avoidance or forfeiture of the certificate in the event the holder should die by his own hands,—*held* that, by force of the recitals, stipulations and provisions above noted, a by-law, enacted by the corporation after the certificate was issued and accepted, providing that a certificate of this class should be forfeited if the member, *whether sane or insane*, should take his own life, entered in-to, and formed a part of the certificate, avoiding it in the event the hold-er, *whether sane or insane*, should take his own life.

3. *Power of corporations to change contracts by subsequent by-laws; when such by-laws become part of the contract.*—While it is only existing by-laws of a corporation which are presumed to be known, and in refer-ence to which it is presumed corporate contracts are made; and while it is true that a corporation has not the power, by laws of its own enactment, to disturb or divest rights which it had created, or to impair the obliga-tion of its contracts, or to change its responsibilities to its members, or to draw them into new and distinct relations; yet, parties may contract with corporations in reference to laws of future enactment, and may agree to be bound and affected, as they would be bound and affected if such laws were existing; and they may thereby consent that such laws may enter into, and form part of their contracts, modifying or varying them.

4. *Life insurance; meaning of the words, "takes his own life."*—The words, "takes his own life," when used in a clause of a policy of life in-surance providing for a forfeiture, have a known and definite legal signi-fication, importing *suicide;* that the policy holder must not become a *felo de se;* must not "deliberately put an end to his own existence, or com-mit any unlawful, malicious act, the consequence of which is his own death; and this implies that he must be "of years of discretion and in his senses."

5. *Same; plea setting up the taking of life as a forfeiture; when insuffi-cient.*—Hence, a plea to an action on a policy of life insurance, setting up a forfeiture, and averring, as a ground therefor, that the assured came to his death by taking his own life, is sufficient, although it is not averred that the self-destruction was willful, or that the assured was sane at the time he took his life. Such an act being averred, if it is intended to ex-cuse it because of the mental unsoundness of the assured at the time of its commission, that fact, the matter of excuse, should be replied by the plaintiff.

6. *Same; forfeiture of by suicide.*—A clause in a policy of life insur-ance, providing for a forfeiture in the event the assured should, while sane, take his own life, is the mere declaration or expression of the im-plication of the law; as such an event would operate a forfeiture in the absence of an express provision in the policy to that effect.

7. *Same; may provide for forfeiture by assured taking his own life while insane.*—A life insurance company may lawfully stipulate in its policy

[Supreme Commandery Knights Golden Rule v. Ainsworth.]

for a forfeiture thereof, in the event the assured should take his own life *while insane.*

APPEAL from Limestone Circuit Court.

Tried before Hon. HENRY C. SPEAKE.

This was an action by Sarah M. Ainsworth, widow of S. M. Ainsworth, deceased, against The Supreme Commandery of the Order of the Knights of the Golden Rule, a corporation created and organized under the laws of the State of Kentucky; was founded on an instrument in writing called a "Knight's Benefit Certificate;" and was commenced on the 28th March, 1882. The instrument declared on is set out *in hæc verba* in the complaint, and, omitting the caption and signatures, is in the following words: "This certifies that the order, 'Knight of the Golden Rule,' has been conferred upon comrade S. M. Ainsworth, and that he is a member of the order in good standing, in Castle Limestone, No. 137, located at Athens, State of Alabama. And in consideration of the representations and declarations made in his application for this certificate, which application is on file in the Supreme Secretary's office, and is made a part hereof, and the payment of the admission fee of one dollar; and in consideration of the payment hereafter to the Knights' Benefit Fund of this class of the Order, of all assessments as levied and required by the Supreme Commandery, the full compliance with all the laws of this order, now in force, or that may hereafter be enacted, and the being in good standing under said laws, the sum of $2,000, together with accrued assessments, will be paid from the Knights' Benefit Fund of the Third Class of this Order, by the Supreme Commandery, Knights of the Golden Rule, to his wife, Sarah M. Ainsworth, as said comrade has directed in his application for this certificate, or as he shall hereafter direct in an application for a change thereof, under the laws of the order, upon due notice and proof of his death, and proof of his good standing in the Third Class of the order at the time of his death, and the surrender of this cirtificate, but not otherwise. Provided, however, that if there shall not be sufficient members in this class to pay the maximum benefit, there shall only be paid a sum equal to one dollar for each member in good standing in this class at the time of the death of said comrade, S. M. Ainsworth, less ten per cent. to the expense and reserve fund, as provided by law, together with the full amount of said comrade's accrued assessments, paid by him in this class. And provided further, that any violation of the above mentioned conditions, or of the requirements of the laws now in force, or hereafter enacted, governing the order, or this class, shall render this certificate null and void, in which event the Supreme Commandery shall not be liable for the above sum or any part thereof. In witness whereof," etc.

[Supreme Commandery Knights Golden Rule v. Ainsworth.]

The defendant filed a special plea, the substantial averments of which are stated in the opinion, to which the plaintiff interposed a demurrer, assigning, in substance, the following grounds: (1) That the by-law providing a forfeiture in the event any member should take his own life, whether sane or insane, was enacted after the insurance was perfected; and (2) that the plea fails to aver that said S. M. Ainsworth took his own life *willfully*. This demurrer was sustained by the court; and the defendant "refusing to plead further in this cause," a judgment was rendered against it in plaintiff's favor for two thousand dollars, and costs. From that judgment the defendant took this appeal, and here assigns the ruling of the court on the demurrer to the plea as error.

G. C. CHANDLER, and E. MAYES, for appellant.—(1) The general proposition is admitted, that by-laws in violation of common rights are void; as also are those which seek to establish rules violative of the contract rights of third parties. But it is maintained that what may be bad, considered merely as a *by-law*, may yet be good, considered as a contract; since a man may part with a common right, or a contract right voluntarily, of which it would be impolitic and unjust to deprive him by a by-law passed without his assent, or perhaps knowledge, by those who might not know, or would not consult his individual interests. Hence, it will be found that a by-law may be void as against strangers, or members who do not assent to it, and yet be good as a contract by members who do assent to it.—Ang. & Ames on Corp. § 342; *Stetson v. Kempton*, 13 Mass. 272; *Davis v. Proprietors, etc.*, 8 Met. 321; *Adley v. Whitstable Co.*, 17 Ves. 323. (2) Ainsworth assented to the by-law in several different ways, and at several different times: First, by operation of the constitution of the association when he joined it, the company being organized on the mutual plan. An individual insured in a mutual insurance company becomes a member of the corporation by that act, and is bound to inform himself of its rules and regulations (*a portion* of its constitution), and he is bound by them.—*Mitchell v. Lycoming Mut. Ins. Co.*, 51 Penn. St. 402; *Belleville Ins. Co. v. Van Winkle*, 1 Beasl. 333; *Susquehanna Ins. Co. v. Perrine*, 7 Watts & S. 348; *Diehl v. Adams Mut. Ins. Co.*, 58 Penn. St. 443; *Coles v. Iowa St. Mut. Ins. Co.*, 18 Iowa, 425; *Woodfin v. Asheville Mut. Ins. Co.*, 6 Jones Law (N. C.) 558. Second, by his application, in which he expressly agreed: "I accept my K. B. Certificate subject to the laws now in force, *or which may be hereafter enacted* by the Supreme Commandery." And, third, by accepting the certificate of membership, with its stipulations and conditions. (3) Where a policy is expressly made subject to the by-laws, they

become an essential part of the contract of insurance, and a strict compliance with their provisions and conditions is necessary to sustain an action on the policy.— *Wellcome v. People's Eq. Mut. Fire Ins. Co.*, 2 Gray, 480; *Bowditch Mut. Fire Ins. Co. v. Winslow*, 3 Gray, 415; *Gardiner v. Piscataquis Mut. Fire Ins. Co.*, 38 Me. 439. It will not do to say that these principles do not apply to by-laws to be passed in the future, *if the contract contemplates such future passage;* because such a position is subversive of what is perhaps the most definitely settled principle of all our principles of corporations: That where a charter (or contract) is granted and accepted with a power reserved to alter or amend, such alteration or amendment is binding. That is the doctrine of the Dartmouth College case, and all the flood of cases following it. See Bump's Notes of Con. Dec. p. 188, and cases cited; Ang. & Ames on Cor. § 342. (4) Upon the question of a voluntary suicide, intentionally committed by a sane man in the possession of his faculties, knowing how to adapt means to ends, and conscious of the immorality of the act, there is not, as indeed there could not well be, any difference of opinion; and all the authorities agree that such self-slaughter is within an exemption, contained in the policy, from liability on death by suicide, or "death by his own hand." May on Ins. § 307; Bliss on Life Ins. §§ 242–3. And if there is no such clause in the policy, such a death would defeat it. *Washington Ins. Co. v. Wilson*, 7 Wisc. 169; *Hartman v. Keystone Ins. Co.*, 21 Penn. St. 466; *Horn v. A. & U. F. Life Ass'n Co.*, 7 Jur., N. S., 673; *Amiable Ins. Co. v. Bolland*, 2 Dow. & Clark, 1; *Moore v. Woolsey*, 4 E. & B. 243; *Reed v. Royal Ex. Ass'n Co.*, Peake's Add. Cases, 70; *Hatch v. Mut. Life Ins. Co.*, 120 Mass. 550; Bliss on Life Ins. pp. 397, 399, 400. The real question arises in that class of cases in which the policy does provide against death by suicide, or by the hand of the insured, and in which it is claimed that the fatal act was the result of insanity. If the policy *merely* provides that suicide, or death "by his own hand" shall avoid the contract, the weight of authority is, that the company remains liable, on the ground that the acts of the party *are not his own volitions.* See *Life Ins. Co. v. Terry*, 15 Wall. 580; *Gay v. Union Mut. Life Ins. Co.*, 9 Blatch. 142; *Breasted v. Farmers' Loan & Trust Co.*, 4 Hill, 73; S. C. affirmed, 8 N. Y. 299; *Van Zandt v. Mut. Ben. Life Ins. Co.*, 55 N. Y. 169; *Eastabrook v. Un. Mut. Life Ins. Co.*, 54 Me. 224; *Phillips v. La. Eq. Life Ins. Co.*, 26 La. An. 404; *St. Louis Mut. Life Ins. Co. v. Graves*, 6 Bush, 268; *Nimick v. Mut. Ben. Life Ins. Co.*, 3 Brewster, 502; *Cooper v. Mass. Mut. Life Ins. Co*, 102 Mass. 227. The principle to be deduced from these decisions is, that the term, "die by his own hand," which is agreed to be synonymous with

[Supreme Commandery Knights Golden Rule v. Ainsworth.]

suicide, has a technical legal meaning; that the correct use of either term includes the idea of willfulness, while the correct use of the term, "insane," excludes that idea; and, therefore, in pleading to actions on such policies, it is not necessary to aver that the act was willful.—Stephen on Plead., Rule VII, Sub-rule 4. (5) Where the policy provides for a forfeiture when a member takes his own life, *whether sane or insane,* as in this case, it would be wretchedly bad pleading to allege willfulness. That is included by the clause, "sane or insane." The following authorities are conclusive on this point: *Chapman v. Rep. Life Ins. Co.,* 6 Biss. 238; *Bigelow v. Berkshire Life Ins. Co.,* 93 U. S. 284; *Degogorza v. Knickerbocker Life Ins. Co.,* 65 N. Y. 235. (6) The only case which we have seen that seems seriously to militate against the views advanced in this brief, is *Becker v. Farmers' Mut. Ins. Co.,* 48 Mich. 610. But in that case the policy was not made subject to by-laws, to be passed in the future, as we understand the case; and that is the difference which removes the case at bar entirely from under its authority. (7) If it is a sound proposition, that, under this policy, the suicide must have been deliberate and willful, then the insanity, to the extent of an entire absence of co-operating will, should have been replied to the plea. For every man is presumed to be sane until the contrary is shown, and to intend to do that which he does do.

McCLELLAN & McCLELLAN, and J. J. TURRENTINE, with whom were WATTS & SONS, *contra.*—(1) The only ground of forfeiture set up in the plea to which the demurrer is interposed, is a by-law adopted by the appellant nearly two months after S. M. Ainsworth took out the policy sued on, with which he had no connection. The rights of the parties under the policy had vested prior to the enactment of the by-law, and, therefore, the by-law, as far as this policy is concerned, is retroactive, null and void.—78 N. Y. 159, 178; 31 Mich. 458; 17 Penn. St. 136; 34 Me. 451; 2 Gray, 543; 45 N. H. 292; 21 Barb. 513; 19 Ala. 619, 707, 439; 7 Johns. 477; 9 Cal. 112; 1 Keble, 733; T. Charlt. 173; Ang. & Ames on Cor. 336-45; Cooley on Con. 273–76, 290–92. The appellant had no power conferred on it by its charter to pass a retrospective by-law.—2 Gray, 543–9; Ang. & Ames on Cor. 339–45. Nor does the by-law, on its face, give any indication that it was intended to have any but a prospective operation.—19 Ala. 619, 707, 439. (2) The position of appellant's counsel, that the appellee must submit to this annihilation of her vested rights, because this is a *mutual* insurance company, can not be maintained. As far as this policy is concerned, she is as much entitled to protection as a stranger would be.—Bliss on Ins., § 463,

p. 734; 17 Penn. St. 136; 34 Me. 451. (3) But it is contended that this by-law, though bad as a by-law, is good as a contract. There is nothing in the record to show that S. M. Ainsworth ever saw, knew, or heard of any such by-law. It is, however, sought to be transformed into a contract, because it is stipulated in the policy that the holder would abide by any by-law that might "thereafter be enacted." But this gave no power to the appellant to deprive the holder of his vested rights under the policy.—31 Mich. 458; 2 Gray, 543, 546; 78 N. Y. 159, 178; 34 Me. 451; 4 Metc. 164. The analogy sought to be drawn from the power reserved by the legislature to alter, repeal, or amend a railroad or other charter, affords no support whatever for the by-law. Even in such case the obligation of a contract is preserved inviolate.—99 U. S. 700, 748; 93 U. S. 524; Wade on Retro. Laws, 81–3. (4) The appellant's counsel have succeeded only in producing cases in which a member or stockholder of a corporation has been held to have bound himself by express assent to a prospective by-law, otherwise improperly adopted. Even here the authorities, *supra*, abundantly show that no implied consent or acquiescence will purge the usurpation. Informed, affirmative action alone will preclude the member or stockholder from asserting the irregularity or informality of the passage of the by-law, even as to its future operation.—2 Gray, 543, 544; 31 Mich. 458; 78 N. Y. 159; 4 Metc. 164; 34 Me. 451. (5) The clause under discussion, that S. M. Ainsworth would abide by any by-law "thereafter enacted," is good for too much or too little for the appellant. If it thereby had the power to subsequently alter the contract in one particular, it had it in all. If it could afterwards relieve itself from responsibility in case Ainsworth died "insane," it could, with equal propriety, elude liability, no matter from what cause his life ended. No such absurd construction will or can be contended for. That clause conferred merely the power of direction, regulation, and management, and left unaffected the substantial obligations of the parties. (6) When a forfeiture in an insurance policy is stipulated for in case of "suicide," "death by his or her own hand," or "he or she takes his or her own life," it means a felonious, criminal act, by, of course, a person capable of deliberate, intentional conduct.—4 Hill (N. Y.), 73; 8 N. Y. 299; 3 Man. & Gr. 639; 7 Heisk. 567; 25 Min. 534; 54 Me. 224; 15 Wall. 580; 74 Penn. St. 176; 93 U. S. 232; May on Ins. 347–80. The forfeiture provided for in the by-law is the same as those above, except that the words, "sane or insane," are added. These words do not nullify the previous portion of the forfeiture, "take his or her own life," nor obliterate the settled construction placed thereon. He or she must still take "his or her

own life" *felo de se*, without regard to whether "he or she is sane or insane," before the forfeiture is incurred. Such is the exact legal significance of the language. (7) The only instances, so far as our examination goes, in which a forfeiture similar to the one here involved has been passed on, are *Becker v. Farmers' Mut. Ins. Co.*, 48 Mich. 610; 34 Wisc. 389; May on Ins. 380–1; 93 U. S. 384; 70 Mo. 27; 65 N. Y. 243–52.

BRICKELL, C. J.—A contract of insurance is defined as "an agreement by which one party, for a consideration (which is usually paid in money, either in one sum, or at different times during the continuance of the risk), promises to make a certain payment of money, upon the destruction or injury of something in which the other party has an interest. In fire insurance and marine insurance, the thing insured is property; in life or accident insurance, it is the life or health of a person." *Commonwealth v. Wetherbee*, 105 Mass. 149. The instrument in writing upon which this suit is founded, and which is set out in full in the complaint, entitled a "Knight's Benefit Certificate," has the elements and characteristics of a contract of life insurance. It purports to have been issued by the "Supreme Commandery of the Knights of the Golden Rule," which is averred to be a corporation, created and organized under a law of the State of Kentucky. The commandery thereby promises, on the death of the husband of the appellee, to pay her two thousand dollars, in consideration of the husband having become a member of the order, and having paid the fee for admission to membership, and of his payment in the future of all assessments levied and required by the supreme commandery, upon the condition that he remained a member of the order, in good standing, and complied with all the laws then of force, or subsequently enacted. These are the essential elements of a contract of life insurance, made by a mutual insurance company with one of its members. Life is the risk, and death is the event upon which the insurance money is payable. There is not, as in ordinary contracts or policies, a stipulation for the payment of premiums fixed and certain in amount, at the inception of the risk, and at periods, definitely appointed, during its continuance. The payment of the fee for admission to membership, and of the assessments levied and required by the commandery, are the equivalent of premiums, and form the pecuniary consideration of the contract. The condition expressed, that the assured shall remain a member of the order in good standing, observing its laws, is the expression of that which is implied in all insurance of members by mutual companies. The members of such companies are presumed to know the charter and by-laws, and to contract in reference to

them, though they may not be recited or referred to in the contract.—Bliss on Life Insurance, § 463 *et seq.;* May on Insurance, § 552. Nor is the character or legal effect of the contract varied, because the objects and purposes of the association are benevolent and charitable, rather than speculative, or the derivation of profits from the transaction of business. There are many such associations, having various names, and similar objects and purposes, which are, in contemplation of law, mutual life insurance companies, and as such their contracts are construed and enforced by the courts. Policies, or certificates, issued by them have the essentials and characteristics of such contracts; the payment by the one party in some form, and under some designation, of a pecuniary consideration, and the observance of prescribed duties during the continuance of the risk; and the promise and obligation of the other party, when death happens, to pay the sum assured.—*Commonwealth v. Wetherbee, supra; Bolton v. Bolton,* 73 Me. 299.

The plea interposed does not deny the death of the assured; or that while living he paid the assessments levied and required by the supreme commandery; or that, at the time of death, he was a member of the order in good standing. The averments are, that he came to his death by taking his own life, and that, at the time of the issue of the certificate, there was a general law of the association, rendering it a condition upon which a certificate could issue, and upon which its benefits could be realized, that the member to whom, or upon whose life it was issued, should comply with the "general laws of the order then in existence, or which might thereafter be enacted;" that the present certificate was issued and was by the assured accepted in writing, "subject to the laws of the order now in force, or which may hereafter be enacted by the supreme commandery." On its face the certificate recited, among other things, that any violation of "the requirements of the laws now in force, or hereafter enacted, governing the order or this class, shall render this certificate null and void." And in another place it is recited as a condition upon which the obligation of the certificate depends: "The full compliance with all the laws of the order now in force, or that may hereafter be enacted." The plea further avers the enactment or adoption of a law, by the terms of which a certificate of this class was forfeited, if the member, *whether sane or insane,* should take his own life; the enactment of which was subsequent to the issue of the certificate. The point of controversy is, whether this law, by force of the recitals and stipulations to which we have referred, enters into and forms part of an antecedent certificate, avoiding it in the event a member, *whether sane or insane,* should take his own life.

Vol. LXXI.

The power to make by-laws for the government of the corporate body, fixing and regulating its own duties and that of its members, not inconsistent with its charter, or the purposes and objects of its creation, not repugnant to the common law, or to the laws of the State, constitutional and statutory, is an attribute of every corporation. The power is regarded as of so much importance that it is seldom left to implication, but is in express terms conferred by the law from which corporate existence is derived.—2 Kent, 296; Ang. & Ames on Corporations § 110; 2 Wait's Actions & Defences, 366. When duly enacted by the body to whom the corporate legislative power is delegated, by-laws are binding upon all the members of the corporation, who are presumed to know them, and to contract in reference to them.—Ang. & Ames on Corporations, § 325; Bliss on Life Insurance, § 463. It is the existing by-laws which are presumed to be known, and in reference to which it is presumed corporate contracts are made; as it the existing municipal law of the place in which a contract is made, or is to be performed, that parties are presumed to be conversant with, and which incorporates itself into the contract, measuring their rights and duties. A corporation has not capacity, as the legislative power from which it derives existence has not competency, by laws of its own enactment, to disturb or divest rights which it had created, or to impair the obligation of its contracts, or to change its responsibilities to its members, or to draw them into new and distinct relations.—Ang. & Ames on Corporations, § 399; Bliss on Life Insurance, § 463; *Becker v. Far. Mut. Ins. Co.*, 48 Mich. 610; *Hamilton Mut. Ins. Co. v. Hobart*, 2 Gray, 543; *Great Falls Mut. Ins. Co. v. Harvey*, 45 N. H. 292.

The certificate is silent as to the consequence, if the member whose life was assured should die by his own hands; and the by-laws of the association, or order, when the certificate was issued, contained no provision declaring in that event an avoidance or forfeiture of the certificate. We are not aware that it has anywhere been expressly decided, that voluntary self-destruction by one whose life was insured, and of whose sanity there was no question, would avoid the contract of insurance; or rather, would not fall within its risk, though in that event there was not expressed an exception to the liability of the insurer. The authorities generally seem to proceed upon the tacit or expressed concession or admission, that such is the law. In *Moore v. Woolsey*, 4 Ell. & Black. 243, Lord CAMPBELL said: "If a man insures his life for a year, and commits suicide within the year, his executors can not recover upon the policy; as the owner of a ship who insures her for a year, can not recover upon the policy, if within the year he caused her to be sunk; a stipulation that, in either case, upon such an event, the

policy should give a right of action, would be void." In *Amicable Insurance Society v. Bolland*, 2 Dow. & Clark, 1, (known as *Fauntleroy's case*), it was held by the House of Lords, that though there was not in the policy an exception of the liability of the insurer, in the event the assured came to his death by the hands of public justice, the exception would be implied for the reason, that an express contract for liability in that event would contravene good morals and sound policy. The inference or implication of the law was, therefore, that the execution of the assured by the hands of public justice, for the commission of crime, is not within the risk of the policy. A construction, or an implication, which will preserve the legality of a contract, is preferred to one which will have the opposite effect. Referring to *Fauntleroy's case*, it was said by WOOD, V. C., in *Horn v. Anglo-Australian and Universal Fam. Life Ins. Co.*, 7 Jurist, N. S. 673: "The argument might be pressed, although I do not know that any case has so decided, to the same extent in the case of a person committing suicide while in a sane state of mind, thus committing a felony, and losing his life thereby." In *Hartman v. Keystone Ins. Co.* 21 Penn. St. 466, BLACK, C. J., said, that though the policy was silent in reference to self-destruction, if the accused committed suicide, he was "guilty of such a fraud upon the insurer of his life, that his representatives can not recover for this reason alone." HUNT, J., however, said of this case, in *Life Ins. Co. v. Terry*, 15 Wall. 586, that it was in this respect "confessedly unsound." The case, in its entirety, is not supported by the current of authority. It rules that an exception in the policy, expressed in the words, "should die by his own hands," must be severed and dissociated from other exceptions expressed in words involving the self-criminality of the assured; were to be construed by themselves, and imported "any sort of suicide," leaving it in doubt whether "suicide" expressed intentional, voluntary, or involuntary, accidental self-destruction.

A contract of life insurance is simpler in form, in the relative rights and duties of the insurer and the assured, and differs in many respects from marine, or from fire insurance; yet, the general principles applicable to marine, or fire insurance are applied, so far as consistent with the nature and obligations of the contract, to the contract of life insurance. In all contracts of insurance, there is an implied understanding or agreement that the risks insured against are such as the thing insured, whether it is property, or health, or life, is usually subject to, and the assured can not voluntarily and intentionally vary them. Upon principles of public policy and morals, the fraud, or the criminal misconduct of the assured is, in contracts of

marine, or of fire insurance, an implied exception to the liability of the insurer.— *Waters v. Merchants' Louisville Ins. Co.* 11 Peters, 213 ; *Citizens' Ins. Co. v. Marsh*, 41 Penn. St. 386 ; *Chandler v. Worcester Mut. Fire Ins. Co.*, 3 Cushing, 328. Death, the risk of life insurance, the event upon which the insurance money is payable, is certain of occurrence ; the uncertainty of the time of its occurrence is the material element and consideration of the contract. It can not be in the contemplation of the parties, that the assured, by his own criminal act, shall deprive the contract of its material element ; shall vary and enlarge the risk, and hasten the day of payment of the insurance money.

The doctrine asserted in *Fauntleroy's case*, that death by the hands of public justice, the punishment for the commission of crime, avoids a contract of life insurance, though it is not so expressed in the contract, has not, so far as we have examined, been questioned, though the case itself may have led to the very general introduction of the exception into policies. The same considerations and reasoning which support the doctrine, seem to lead, of necessity, to the conclusion, that voluntary, criminal self-destruction, *suicide*, as defined at common law, should be implied as an exception to the liability of the insurer, or, rather, as not within the risks contemplated by the parties, reluctant as the courts may be to introduce by construction or implication exceptions into such contracts, which usually contain special exceptions. An express contract to pay the insurance money to the assured, in the event he committed suicide, an increased premium being paid because of the risk, there could be but little, if any, hesitancy in repudiating as offensive to law and good morals. The fair and just interpretation of a contract of life insurance, made with the assured, is, that the risk is of death proceeding from other causes than the voluntary act of the assured, producing, or intended to produce it ; and especially of a contract made by an association or organization, with one of its members, the objects and purposes of which is, that the members will contribute to, and bear each other's losses, or the losses of those dependent upon them. The extinction of life by disease, or by accident, not suicide, voluntary and intentional, by the assured, while in his senses, is the risk intended ; and it is not intended that, without the hazard of loss, the assured may safely commit crime.—Bliss on Life Insurance, §§ 242–3.

The by-laws, or general law, adopted by the commandery, subsequent to the issue of the certificate, so far as it declares a forfeiture or avoidance of the certificate, in the event a member, who is sane, takes his life, is not objectionable upon the ground that it varies or impairs existing contracts. It adds no new term or condition to the contract ; it relieves the associa-

tion from no responsibility; it imposes no new or additional duty upon the member, and works no change in his relations. It is the mere declaration or expression of the implication of the law; and "the expression of those things which the law implies works nothing."—2 Parson's Contracts, 515. The law employs the phraseology (and the plea pursues it), not now of infrequent use in contracts or policies of life insurance, "take his own life." These words, when used in a policy of life insurance, have a known and definite legal signification, importing *suicide;* that the member must not become a *felo de se;* must not "deliberately put an end to his own existence, or commit any unlawful, malicious act, the consequence of which is his own death;" and this implies that he must be "of years of discretion, and in his senses."—4 Black. 189. Contracts of insurance, like other contracts, are interpreted so as to meet and satisfy the intention of the parties. Whatever may be the phrase employed, expressive of self-destruction, which is to operate a forfeiture, if not otherwise qualified or limited; whether it be "commit suicide," or "death by suicide," or "death by his own act," or "take his own life," or other equivalent expression, it would be most unreasonable to interpret it as including death by accident, or by mistake, though the direct, immediate act of the assured may have contributed to it. The firing of a weapon not supposed to be loaded, or its discharge not directed against, or intended to reach the person, may cause death. Poison may be taken instead of a curative medicine by accident or by mistake, and the accidents or mistakes from which death may result are innumerable. An extinction of life, unintentional, involuntary, will not fall within such expressions, intended to guard the insurer against the positive, intentional acts of the assured.—2 Parson's Contracts, 475; Bliss on Life Insurance, § 225; *Life Ins. Co. v. Terry*, 15 Wall. 580; *Phadenhauer v. Germania Life Ins. Co.*, 7 Heisk. 567; S. C. 19 Amer. Rep. 623.

The plea, consequently, attaching to its words their known legal signification, when used in, or applied to contracts of life insurance, imports voluntary, intentional deprivation of self-existence by the assured while in his senses. The omission of the word *willful*, as descriptive of the self-destruction, did not render the plea demurrable. If that word had been added, or any similar word, evidence of an intentional, not of an accidental self-destruction, would have met the averment. Evidence of no other than an intentional act will satisfy the present averment. Such an act being shown, if it is intended to excuse it, because of the mental unsoundness of the assured at the time of its commission, the fact, the matter of excuse, ought to have been replied by the plaintiff. The presumption of law is in

favor of sanity, and the burden of proving insanity rests upon the party alleging it.—Bliss on Life Ins. § 378; *Terry v Life Ins. Co.*, 1 Dillon (Cir. Ct.), 403; *Phadenhauer v. Germania Life Ins. Co., supra.*

Policies of life insurance usually contain an exception of the liability of the insurer, in the event of the self-destruction of the assured. There is a contrariety of decision as to the effect of the exception; whether it embraces any and every act of intentional self-destruction, or only *suicide*, criminal self-destruction. The preponderance of authority points to the conclusion that it refers *soley to suicide.—Life Ins. Co. v. Terry, supra; Phadenhauer v. Germania Life Ins. Co., supra; DeGogorza v. Knickerbocker Life Ins. Co.*, 65 N. Y. 232; Bliss on Life Ins. §§ 225–238.

With a view of excepting from the operation of the policy any intended self-destruction, whether the assured is *sane* or *insane* at the time of its commission, insurance companies are in the habit of inserting in policies a provision, the equivalent of that expressed in the law of the association now under consideration. The exception as to the insane has been supported, and it is said to be as much the right of the insurer to stipulate for exemption from liability in the event of intentional self-destruction by the insane, as to stipulate for an exemption from liability because the hazard of loss is increased from the fact of the assured engaging in occupations perilous to life, or taking up residence in an unhealthy climate.—*Bigelow v. Berkshire Life Ins. Co.*, 93 U. S. 284. In this respect, the law adds a new term to the contract, relieves the association from an existing liability, and lessens the value and security of the certificate to the assured.

It is not claimed that there is an inherent power in the association, by the adoption of a by-law, to work such radical changes in its existing contracts. The power is derived from, and depends upon the stipulations of the contract at the time it was made. The stipulations are expressed in varying terms, and several of them import no more than would be implied— the observance by the assured of the requirements of the association, such requirements as were reasonable, and intended to promote the harmony of the association, and the purposes and objects for which it was formed. They import also obedience to the by-laws, so far as reasonable, consistent with the charter and law of the land. We do not construe them as reserving, or as intended to reserve to the association the power to change or avoid its contracts, to lessen its responsibilities, or to divest its members of rights. This is not the proper office of a by-law; and from the general expressions to which we are referring, it can not be fairly presumed or intended that it was contemplated to affect the members by other than such by-laws, as it was

within the competency of the association to enact. But in addition to these, the averment of the plea is, that the certificate was accepted by the assured, "subject to the laws of the order now in force, or which may be hereafter enacted by the supreme commandery." These are words of large signification, and clearly express that the assured consented that the contract should be subject to future, as well as to existing by-laws. Parties may contract in reference to laws of future enactment— may agree to be bound and affected by them, as they would be bound and affected if such laws were existing. They may consent that such laws may enter into and form parts of their contracts, modifying or varying them. It is their voluntary agreement which relieves the application of such laws to their contracts and transactions from all imputation of injustice. An engagement of suretyship relating to a particular office, with prescribed duties, by the common law, extends only to such duties as are prescribed when the engagement is entered into, and not to such as, while the suretyship is continuing, may be attached to the office.—1 *Chitty on Contracts* (11th Am. Ed.), 765, *note.* The statute prescribing the condition of official bonds, and of the bonds of executors, administrators, and guardians, extends the liability of the surety to the performance by the principal of such duties as are required of him by existing laws, or by any law passed subsequent to the execution of the bond.—*Morrow v. Wood,* 56 Ala. 1. There is no injustice in the statute— nothing restrospective in its operation. The surety enters into the bond with knowledge of the condition, assenting that his liability may be enlarged, if public interest and convenience require that the official duties of the principal should be enlarged.

In consequence of the settled doctrine, that the charter of a corporation, whether private or eleemosynary, not instituted as part of the machinery of government, but for the private benefit or purposes of the corporation, is a contract between the State and the corporators, protected by the constitution of the United States from repeal, or alteration, or impairment by subsequent legislation, it has become usual, either by constitutional provision, or by a general law, or by reservation in the charter, to clothe the legislative power of the State with full capacity, at pleasure, to alter, modify, or repeal the charter. The power being reserved, its exercise can not of course be said to impair the obligation of the grant.—Ang. & Ames on Corporations, § 767; Cooley on Con. Lim. 340. The power is reserved by, and is a part of the grant, and that it may be exercised, is a condition upon which the grant of corporate existence and franchises is accepted.

The members of associations, created for purposes and ob-

jects like those which seem to be the purposes and objects of this organization, may very properly be required to assent that the contract conferring upon them rights shall be subject to, and depend upon the future, as well as the existing laws adopted by the governing power. The fundamental principle of such organizations is the mutuality of duty and equality of rights of the membership, without regard to time of admission. This can not well be preserved, if the members stipulating for benefits were not required to consent that they would be subject to future as well as existing by-laws. Time and experience will develop a necessity for changes in the laws, and if the consent was not required, there would be a class of members bound by the changed laws, and a class exempt from their operation. The case before us is an illustration. Of the legality and propriety of the provision relieving the association from liability, if a member while insane deprived himself of life, there is no good reason to question. If no other reason could be given, that it relieves the association from litigating with the representatives of a deceased member the distressing question of his sanity, would be sufficient. If the law was applied only to certificates issued subsequent to its enactment, there would be a class of members having certificates of greater value than the certificates held by another class; yet each class would be subject to the same assessments and the same duties. There is but little room, if any, for the apprehension, that advantage will be taken by the governing body of the assent of the member to be bound and affected by subsequent laws, to impose upon him unjust burdens, or to vary the contract, save so far as an alteration or modification of it may be promotive of the general good. Subsequent or existing by-laws are valid only when consistent with the charter, and confined to the nature and objects of the association. While a subsequent law, because of the assent of the member, may add new terms or conditions to a certificate, terms or conditions reasonably calculated to promote the general good of the membership, and may be valid and binding, it does not follow that a law operating a destruction of a certificate, or a deprivation of all rights under it, would be of any force.—*Korn v. Mut. Ass'n Society,* 6 Cranch, 192.

Without pursuing the discussion of the question, we are of opinion that the parties intended the certificate should be subject to the laws of the association adopted subsequent to its issue—laws, which if they had been of force at the time of the issue, would have entered into, and formed part of it. It is the concurring assent of the parties, that engrafts the law upon the certificate, giving it an operation it would not have otherwise.

The Circuit Court erred in sustaining the demurrer to the plea, and its judgment is reversed and the cause remanded.