RITTER v. MUTUAL LIFE INS. CO. OF NEW YORK.

(Circuit Court of Appeals, Third Circuit. December 2, 1895.)

No. 2.

1. LIFE INSURANCE—SUICIDE OF INSURED.
The personal representatives of one who, when sane, deliberately kills himself, with the intent to secure to his estate the amount of insurance he has effected upon his life, cannot recover the insurance money, though the policy contains no provisions respecting suicide.

2. SAME—INTENT TO DEFRAUD.
One R., who already carried life insurance to the amount of $315,000, took out additional policies in the M. Ins. Co., amounting to $75,000. At the time such policies were issued, R. was insolvent; his income was wholly inadequate to pay the expenses of his family and the premiums on his life insurance; he was engaged in hazardous stock speculations, and had embezzled large sums of money. At the time of the issue of the $75,000 insurance, R. also took out another policy for $20,000, for the benefit of his wife, and, shortly after, $90,000 more in his own name. Within a year after the issue of the $75,000 policies, R., while sane, deliberately committed suicide, leaving a letter to his executor describing his liabilities and his insurance, and directing the application of the proceeds of the policies to his debts. Other letters left by him also indicated that his purpose in committing suicide was to secure the insurance money for the payment of his debts. Held, that it was not error to refuse to instruct the jury, in an action by R.'s executor against the M. Ins. Co., that there was no evidence that R. entered into the contracts of insurance with the intention of defrauding

the company, or that he entered into such contracts with the intention of committing suicide.

3. SAME—SANITY.

The court, in such action, instructed the jury that if R. killed himself while his reasoning faculties were so far impaired by insanity that he was unable to understand the moral character of his act, even if he did understand its physical nature and effect, such self-destruction would not prevent recovery on the policies, and explained the expression "moral character of his act" by adding that if R. understood, as a sane man would, the consequences to follow from his suicide to himself, his character, his family, and others, and was able to comprehend its wrongfulness, then he was to be regarded as sane, and charged that, if R. was sane when he committed suicide, such suicide was a defense to the policy. *Held* no error.

In Error to the Circuit Court of the United States for the Eastern District of Pennsylvania.

This was an action by A. Howard Ritter, executor of the last will of William M. Runk, deceased, against the Mutual Life Insurance Company of New York, to recover upon policies of life insurance, aggregating $75,000. Upon the trial in the circuit court (69 Fed. 505), the jury rendered a verdict for the defendant. Plaintiff brings error. Affirmed.

Richard C. Dale and Geo. Tucker Bispham, for plaintiff in error.

John G. Johnson, for defendant in error.

Before ACHESON and DALLAS, Circuit Judges, and WALES, District Judge.

ACHESON, Circuit Judge. This was an action brought by A. Howard Ritter, executor of the last will of William M. Runk, late of the city of Philadelphia, deceased, against the Mutual Life Insurance Company of New York, upon six policies of insurance, together amounting to the sum of $75,000, all bearing date November 10, 1891, issued by the defendant company to William M. Runk upon his life. On the 5th day of October, 1892, Mr. Runk, with great deliberation, committed suicide by a pistol shot, at a time when, as evidence indicates and the jury has found, he was of sound mind, and able to understand both the physical and the moral character and consequences of his act of self-destruction. At the time of his suicide, Mr. Runk carried insurance upon his life to the amount of $500,000, the policies for which had been issued to him by a number of different companies. When the policies here in suit were taken, Mr. Runk already carried upon his life policies of insurance issued by other companies to the amount of $315,000, of which $135,000 had been assigned by him to his aunt, Mrs. Barcroft, as collateral security for moneys he owed her. At the same time that he effected the insurance which is the subject-matter of this suit, Mr. Runk took out another policy of insurance upon his life in the defendant company, for the benefit of his wife, for $20,000. Shortly thereafter, in the month of January, 1892, he took out in his own name additional insurance upon his life to the amount of $90,000, in other companies. In connection with the facts already stated, there was evidence upon the trial of this case tending to show that, at the time the policies in suit were taken out, Mr. Runk was insolvent;

that his entire income did not exceed $700 a month, out of which he had to. support his family; that theretofore he had been engaged in, and thereafter continued to be engaged in, stock speculations on a large scale, in which he sustained heavy losses; that he had then begun a system of surreptitious withdrawals (amounting at his death to $86,000) of his contribution of $100,000 to the capital stock of the firm of Darlington, Runk & Co., of which he was a member, in violation of his partnership obligations, and which withdrawals he artfully concealed; and it appeared, further, that, before the date of the policies in suit, Mr. Runk had embezzled funds of the Protestant Episcopal City Mission, of which he was treasurer, to the amount of about $80,000. On the day of his death, or the day before, Mr. Runk wrote a letter to the executor named in his will, Mr. Ritter, giving a particular account of his liabilities, and a list of his insurance policies, and directing the application of the insurance moneys to his indebtedness. This letter and also other letters in evidence, written by Mr. Runk just before he shot himself, clearly evince that he deliberately committed suicide, with the intention· and in order that the insurance he had effected on his life might be collected by his executor, and applied to the payment of his liabilities.

As the case went to the jury, the only question of fact submitted to that tribunal was the question of the testator's sanity at the time he took his life. Nevertheless, error is assigned to the refusal of the court to affirm the plaintiff's first and second points, namely:

"(1) The evidence is not sufficient to warrant the jury in finding that the deceased entered into the contracts of insurance evidenced by the policies sued upon with the intention of defrauding the company defendant issuing the same.

"(2) The evidence is not sufficient to warrant the jury in finding that the deceased entered into the said contracts of insurance with the intention of committing suicide."

The assignments of error under this head raise the question whether there was any evidence in the cause which would have justified the jury in finding that the policies in suit had been taken out by William M. Runk with the fraudulent purpose of ending his life by his own hand. We think that there was such evidence, and that the affirmation of the above-quoted points would have been erroneous. True, it was not shown by the declarations of the insured, or by other like positive evidence, that, at the time he effected the insurance, he had formed the purpose to take his life. But such direct evidence of dishonest intention is rarely obtainable. Fraudulent intention is seldom openly avowed, and ordinarily its existence must be deduced from the circumstances surrounding the particular transaction, apparent motive, and conduct before and after the event. Here we have a man heavily in debt and insolvent, who had unlawfully appropriated to his own use trust funds, and was in constant danger of exposure, who had plunged into hazardous stock speculations, and who was already carrying an unusually large amount of life insurance, his income being grossly inadequate

to pay the accruing premiums on that insurance and maintain his family. In this desperate state of affairs, this man takes out additional life insurance, amounting (with the policy in favor of his wife) to the large sum of $95,000, which he knew he could not maintain for any great length of time. Then, about two months later, we find him still further increasing his life insurance by other policies to the amount of $90,000. Nine months thereafter, when in a sane condition of mind, he takes his life, with the expressed purpose of enabling his estate to realize upon his life policies, leaving specific written directions to his executor how to apply the insurance moneys in discharge of his liabilities. It is, indeed, the fact that Mr. Runk's suicide followed immediately after certain irregularities in his conduct of the business of Darlington, Runk & Co. had been detected, and when full exposure of his misconduct was imminent. Still, however, it was for a jury to determine, under all the circumstances, when Mr. Runk first formed the design to take his life; and the evidence, we think, would have well warranted the finding that, at the time he took out the policies in suit, he was preparing for the worst, and that he then contemplated and had determined upon self-destruction should his stock speculations fail him in the near future. We are not, then, able to sustain any of the assignments of error upon this branch of the case.

The plaintiff's fourth point was in these words:

"(4) The mere fact that the insured committed suicide does not, standing alone, avoid the policies, there being no condition to that effect in the policies."

The defendant's first point was as follows:

"(1) There can be no recovery by the estate of a dead man of the amount of policies of insurance upon his life if he takes his own life designedly, whilst of sound mind."

The plaintiff's fourth point was refused, and the defendant's first point was affirmed; and the court charged the jury that if the insured, Mr. Runk, was in a sane condition of mind at the time of his self-destruction, his suicide was a defense to this suit. These instructions are assigned for error, and the assignments raise the question whether the personal representative of one who, when sane, deliberately kills himself, with the intent to secure to his estate the amount of insurance he has effected upon his life, can recover the insurance money, the policy containing no provision with respect to suicide. It is conceded that this precise question was not involved or decided in any case prior to the present one. In the cases brought to our attention where suicide, during sanity, by the person whose life was insured, was held not to be a valid defense, the policy was issued for the benefit of some other person, or an independent interest, by assignment or otherwise, had been acquired by a third person. Not one of the decisions, we think, gives countenance to the idea that the personal representatives of the insured can recover where the latter, while sane, deliberately commits suicide for the purpose of compelling payment of the insurance money to his estate. That there can be no recovery in such case has been asserted by courts and judges whose expressions of opinion command great respect.

In Moore v. Woolsey, 4 El. & Bl. 243, 254, Lord Campbell said:

"If a man insures his life for a year, and commits suicide within the year, his executors cannot recover upon the policy; as the owner of a ship who insures her for a year cannot recover upon the policy if within the year he causes her to be sunk. A stipulation that in either case, upon such an event, the policy should give a right of action, would be void."

In Hartman v. Insurance Co., 21 Pa. St. 466, 479, it was said:

"Besides this, the court was very plainly right in charging that, if no such condition had been inserted in the policy, a man who commits suicide is guilty of such a fraud upon the insurers of his life that his representatives cannot recover for that reason alone."

This observation has been criticised, and, standing by itself, it may appear to be too sweeping. Hartman's Case, however, did not involve any question of insanity, and the court was speaking of suicide by a sane man.

In Supreme Commandery v. Ainsworth, 71 Ala. 436, 447, the court said:

"Death—the risk of life insurance, the event upon which insurance money is payable—is certain of occurrence. The uncertainty of the time of its occurrence is the material element and consideration of the contract. It cannot be in the contemplation of the parties that the assured, by his own criminal act, shall deprive the contract of its material element, shall vary and enlarge the risk, and hasten the day of payment of the insurance money."

The above-quoted views, as applied to suicide by a sane man, who kills himself to the end that his estate shall thereby be benefited by the enforcement of a policy of insurance on his life, are, we think, just, and sustained by the soundest reason. It is a fundamental condition of the contract of life insurance, even if the policy be silent on the subject, that the insured, while in a sound mental condition, will not voluntarily destroy his life. The contract would lack mutuality of obligation if the insured, at his own pleasure, by intentional self-destruction, could terminate the payment of the stipulated premiums, and precipitate the payment of the sum insured. To sanction a recovery in such a case would be to reward fraud and encourage wrongdoing.

In Insurance Co. v. Armstrong, 117 U. S. 591, 600, 6 Sup. Ct. 877, Mr. Justice Field said:

"It would be a reproach to the jurisprudence of the country if one could recover insurance money payable on the death of a party whose life he had feloniously taken. As well might he recover insurance money upon a building that he had willfully fired."

There is, it seems to us, in principle, no distinction between the instances thus put by Justice Field and the case now before us. It is conceded that if, at the time a policy of life insurance is obtained, the insured has formed the purpose of ending his life, his suicide would defeat a recovery. But what difference does it make when such purpose is conceived? Willful self-destruction by the insured, when he is sane, is equally a fraud upon the insurer whether the purpose to commit the act is formed before or after the policy is taken. In our judgment, the rulings of the court below upon this subject were right.

The remaining assignments of error relate to the instructions of the court as to what constitutes that degree of mental unsoundness which will relieve against what otherwise would be the consequence of self-destruction. Here it seems to be proper to cite at length the plaintiff's fifth point, and the answer thereto, and the accompanying observations made by the court. These were as follows:

"(5) If one whose life is insured intentionally kills himself when his reasoning faculties are so far impaired by insanity that he is unable to understand the moral character of his act, even if he does understand its physical nature, consequence, and effect, such self-destruction will not of itself prevent recovery upon the policies."

"This is affirmed. I will say, however, that we must understand what is meant and intended by the term 'moral character of his act.' It is a term which has been used by the courts, and is correctly inserted in the point; but it is a term which might be misunderstood. We are not to enter the domain of metaphysics in determining what constitutes insanity, so far as the subject is involved in this case. If Mr. Runk understood what he was doing, and the consequences of his act or acts to himself as well as to others,—in other words, if he understood, as a man of sound mind would, the consequences to follow from his contemplated suicide, to himself, his character, his family, and others, and was able to comprehend the wrongfulness of what he was about to do, as a sane man would,—then he is to be regarded by you as sane; otherwise, he is not."

In a subsequent part of the charge, the court said:

"I therefore charge you that if he was in a sane condition of mind at the time, as I have described, able to understand the moral character and consequences of his act, his suicide is a defense to this suit."

We are not able to discover in these instructions anything of which the plaintiff in error can justly complain. The explanatory remarks which the learned judge made in connection with his affirmance of the plaintiff's fifth point were pertinent and proper. Upon the question of insanity, the jury was plainly informed that, to prevent a recovery, it was not enough that Mr. Runk understood the physical nature, consequence, and effect of his act of self-destruction, but that he must also have understood the moral character and consequences of the act, and that, if he did not comprehend its wrongfulness, he was to be regarded by the jury as insane. Nor were the instructions of the court inadequate to the facts of the case. We think that they fully covered the question of insanity here involved. We do not perceive that, in the instructions complained of, there was any departure from the principles approved by the supreme court in the cases of Insurance Co. v. Terry, 15 Wall. 580; Insurance Co. v. Rodel, 95 U. S. 232; Insurance Co. v. Broughton, 109 U. S. 121, 3 Sup. Ct. 99, and Insurance Co. v. Akens, 150 U. S. 468, 14 Sup. Ct. 155. The charge, we think, conformed to the rulings in those cases.

We are of the opinion that this record discloses no error, and the judgment of the circuit court is affirmed.