ELLEN BOLTON *vs.* ADDIE M. BOLTON.

Kennebec. Opinion April 7, 1882.

*Masonic relief associations. Life insurance. Contract. " Widow." Evidence.*

The Kennebec Masonic Relief Association is a mutual life insurance company, notwithstanding the organization is benevolent and not speculative in its purposes.

When an accepted applicant for membership pays his membership fee and promises in his written application to pay the further sum of one dollar and ten cents whenever any other member dies, or forfeit his own claim to a benefit; and the by-laws provide that the association, within thirty days after satisfactory proof of his death, will pay to his " widow" as many dollars, not exceeding one thousand, as there are surviving members at the time of the death,—a contract of life insurance is completed.

*Also held,* that the contract being in writing, and unambiguous, and being in terms payable to the widow, the legal widow was entitled to the benefit; and that no evidence *dehors* the written contract, was admissible to vary its construction and show that another woman with whom the deceased member went through the form of marriage, and cohabited for many of the last years of his life, was intended.

ON EXCEPTIONS.

Assumpsit for money had and received.

The opinion states the case and the material facts.

*Orville D. Baker* (*Joseph Baker* with him), for the plaintiff, cited, on defendant's exceptions: R. S., c. 55, § 5 ; *Schunck* v. *Gegenseitiger*, &c. 44 Wis. 369 ; *Erdmann* v. *Mutual Ins. Co.*

44 Wis. 376; *Kentucky Masonic Ins. Co.* v. *Miller*, 13 Bush. 489; *Masons' Benev. Soc.* v. *Winthrop*, 85 Ill. 537; *Same* v. *Baldwin*, 86 Ill. 479; *State* v. *Mut. Benev. Soc.* 22 Alb. L. J. 427; *State* v. *Mut. Benefit Soc.* 105 Mass. 149; Bliss, Life Ins. § 463; *Coles* v. *Iowa St. Mut. Ins. Co.* 18 Iowa, 425; *Simeral* v. *Ins. Co.* 18 Iowa, 319; *Treadway* v. *Ins. Co.* 29 Conn. 68; *Com.* v. *Wetherbee*, 105 Mass. 149.

On plaintiff's exceptions: Stephen's Dig. Ev. art. 91, par. 8; 1 Greenl. Ev. § § 290, 287; *Cotton* v. *Smithwick*, 66 Maine, 365; *Tucker* v. *Seaman's Aid Soc.* 7 Met. 188; Whart. Ev. § 992; Wigram on Wills, 66; *Dorin* v. *Dorin*, English and Irish Appeal Cases, 568; *Re Davenport's Trust*, 1 Sm. & Giff. 126.

*J. H. Potter*, for the defendant, claimed that as the specifications in plaintiff's writ contained the allegation that the sums of money were obtained by defendant by falsely and fraudulently representing herself to be the wife of James H. Bolton, and no proof of such false and fraudulent representation was offered or existed, the action could not be maintained, the plaintiff not supporting by evidence, the material allegation in her writ. And further claimed, that as these associations were benevolent and charitable organizations, and both voluntary, and as no action could be maintained against them by either the defendant or plaintiff, and as the payment to defendant was voluntary, no action could be maintained by plaintiff against defendant to recover the money back.

Both associations were Masonic Relief Associations, one incorporated under c. 55, of R. S., the other not incorporated. They were not organized for business purposes, having in view pecuniary gain and profit to its members. Their sole object was to relieve the widow or orphans of a member after his decease. Such associations are clearly benevolent or charitable. 46 N. Y. 477. And both voluntary. Neither the defendant nor the plaintiff could have maintained an action against either of these associations, c. 55, § 5, R. S. The money paid to defendant was in law a gift, a gratuity, and it was paid voluntarily without

fraud or imposition on her part. It was a gift made perfect by delivery and acceptance, and the associations could not in an action recover it back.

These associations have not the character of a life insurance company, and the wife of a member acquires no right against the association on her husband's death. *Durian* v. *Central Verein of Hermann's Soehnne,* 7 Daly, N. Y. 168; 1 Parsons on Contracts, 235.

Neither the plaintiff nor defendant had a legal claim against the associations for the benefits. But the money was paid to the defendant, and the maxim, "*Melior est conditio possidentis, ubi neuter jus habet,*" applies with full legal force. Also, see *The People ex ul.* v. *The Board of Trade of Chicago,* 80 Ill. 134; *Robinson* v. *Yates City Lodge of F. A. A. Masons.* We cite further, *Trustees of Dartmouth College* v. *Woodward,* 4 Wheat. 518.

The instruction excepted to was sound law. For when it is doubtful as to which of two or more extrinsic objects or persons, a provision in itself unambiguous, is applicable, then evidence of the declaration of intention of the party or parties making the provisions, is admissible. Wharton's Evidence, vol. 2, p. 236, § 992, and § 997.

In the construction of contracts evidence of concurrent intention, is admissible. Wharton's Evidence, vol. 2, p. 234.

And in the case in 7 Daly, above cited, the court held that if the member himself should designate, it would be sufficient, and that "it makes no difference in such a case that the person designated to receive it, is falsely called the wife of the member, his intentions being clear."

VIRGIN, J. In 1846, one Bolton married the plaintiff in Boston, and on the same day went with his wife to the homestead of his father, in Manchester, where they resided and cohabited about eight months, when they moved to Lowell, where they resided and kept house some four or five months, during the latter part of which period, a child was born to them. Soon afterward, they removed with their child to Manchester, where they continued to reside some less than a year, when Bolton left his family say-

ing he was going to California; since which time the plaintiff never heard from him or of him, until after his decease in 1879.

In 1862, Bolton, so far as the forms of law are concerned, married the defendant in Boston, where they resided and cohabited except while at sea, until November, 1867, when they moved to Augusta in this State, where they continued to reside until his death, the defendant never having heard of his marriage with the plaintiff, during his lifetime.

In October, 1877, Bolton was duly made a member of the "Kennebec Masonic Relief Association," and in August, 1878, of the "Mechanic Falls Masonic Relief Association," in each of which he continued in good standing, until his decease.

On June 3, 1879, Bolton died; and on the eleventh day of the same month, the defendant received from the former association, as the benefit due to his widow by virtue of his membership, the sum of four hundred and forty-eight dollars, and on the twenty-fourth, from the latter association the sum of one thousand dollars.

On October 21, 1879, the plaintiff brought this action to recover the sums thus received by the defendant, and alleged in her specifications filed under the count for money had and received, that the defendant obtained the money from each of the associations by "falsely and fraudulently representing herself to be the widow of Bolton." And at the trial, the presiding justice instructed the jury, against the contention of the defendant, that it was not necessary for the plaintiff to prove the allegation of fraudulent representation on the part of the defendant.

The defendant also contended that the associations were benevolent and charitable in their purpose and character, and not speculative; that one of them was incorporated under the provisions of R. S., c. 55, against which no action could be maintained by the plaintiff or defendant by reason of § 5; that the payment to the defendant by the associations was voluntary, in the nature of a gift; and that the plaintiff could not maintain this against the defendant in any event which the presiding justice overruled; whereupon the defendant alleged exceptions.

1. So far as the first point is concerned, we do not understand the defendant to urge it, except so far as it may be involved in the other.

2. Is the Kennebec Masonic Relief Association such a corporation as is contemplated by R. S., c. 55, § 5? We have no doubt that it is not. But if it were, that fact could have no bearing upon this action, since the terms of the statute apply only to members of the association and the corporation itself, and neither of these parties is a member. Even if it had adopted the name of benevolent or charitable, instead of relief association, it could make no difference. Its name would not necessarily fix or establish its real legal character. When occasion requires, the law looks through or behind the names of things and passes its judgment upon their substance. *Governors, etc.* v. *Am. Art Union,* 7 N. Y. 228; *State* v. *Citizens' Benefit Asso.* 6 Mo. App. 163. If the prevalent purpose and nature of an association, of whatever name, be that of insurance, the benevolent or charitable results to its beneficiaries would not change its legal character. And that this association, *et id omne genus* are mutual life insurance companies, we entertain no doubt whatever.

The text books, as well as the opinions of various courts, contain definitions of the contract of insurance as it is applied to its various subjects; and although differently expressed, they all concur as to its substantive elements, that all that is essential to such a contract is the payment of a consideration by one party, and the promise of the other to pay an agreed amount upon the happening of the contingency specified in the contract, it being understood that the former party had an insurable interest in the subject-matter insured. *Commonwealth* v. *Wetherbee,* 105 Mass. 160.

By the provisions of the by-laws of the Kennebec Masonic Relief Association, any member of a lodge of masons within this State, not over sixty years of age, may become a member thereof, by presenting his application stating therein certain specified facts, and the certificates prescribed, and paying a membership fee of two dollars. And on the receipt thereof, his name is placed on the list of members and he becomes "entitled to all the

benefits from that date," (art. 4, § 1), the maximum amount of benefit being limited to one thousand dollars, § 3. Upon the death of a member entitled to a benefit, an assessment of one dollar and ten cents is laid on each survivor, and if not paid within a month, the delinquent forfeits his membership. Art. 9, § 1. Upon satisfactory proof of the death of a member, the president and secretary draw a draft on the treasurer for as many dollars, not exceeding one thousand, as there were members who had paid their assessments at the time of the death, "payable to the widow of the deceased member . . . provided, any member, during his life-time, may direct in writing signed by himself and two witnesses, to whom the benefit shall be paid." Art. 8, § 1.

Bolton's application, after reciting the facts necessary to show his eligibility, promised to abide by the by-laws, etc., pay promptly any assessment authorized thereby, and in default thereof to forfeit his membership, and authorized the secretary to sign his name to the by-laws.

The substance of all which is : Each member, when accepted, pays his membership fee of two dollars, and promises to pay the further sum of one dollar and ten cents whenever any other member dies, or forfeit his own claim to a benefit. And in consideration thereof, the association agrees that within thirty days after the proof of the death of a member, it will pay to his "widow," as many dollars, not exceeding one thousand, as there are surviving members at the time of the death. The interest of the member in his own life, supports the contract. *Campbell* v. *N. E. Mut. L. Ins. Co.* 98 Mass. 381.

To be sure the association takes no note of the modern science of biological contingencies, but each applicant, regardless of age up to sixty years, if otherwise eligible, becomes a member by contributing the same sum to the general fund, and his beneficiary draws substantially the same amount, thus adopting the old original simple principles of life insurance, and making the association a mutual co-operative life insurance body. "This is not the less a contract of mutual insurance upon the life of the assured, because the amount to be paid by the corporation is not a gross sum, but

a sum graduated by the members holding similar contracts; nor because a portion of the premiums is to be paid upon the uncertain periods of the deaths of such members; nor because in case of non-payment of assessment of any member, the contract provides no means of enforcing payment thereof, but merely declares the contract at an end, and all moneys previously paid by the assured, to be forfeited to the company. The fact that the organization was benevolent and not speculative, has no bearing upon the nature and effect of the business conducted and contracts made by the corporation." *Commonwealth* v. *Wetherbee, supra.* And we may add to this list of facts the limitation of membership to persons belonging to the masonic fraternity, together with the various other differences between modern life insurance companies and those under discussion, suggested (ironically) by the defendant's counsel.

There are large numbers of similar associations in the various states, known by different names but governed by like rules, all recognized as mutual life insurance companies when before the courts. *Citizens' Benefit Asso.* 6 Mo. App. 163; *State* v. *Bankers' etc. Benefit Asso.* 23 Kans. 499; *Folmer's Appeal,* 87 Pa. St. 133; *Fairchild* v. *N. E. M. L. Asso.* 51 Vt. 613; *Schunck* v. *Gegenseitiger, &c. Fond,* 44 Wis. 369; *Erdmann* v. *Mut. Ins. Co. etc.* 44 Wis.; *Maryland Mut. Ben. Soc.* v. *Clendenien,* 44 Md. 429; *Arthur* v. *Odd Fel. Ben. Asso.* 29 Ohio St. 557, 376; *Ken. Mas. Ins. Co.* v. *Miller,* 13 Bush. (Ken.) 489; *Masons' Benev. Soc.* v. *Winthrop,* 85 Ill. 537; *Same* v. *Baldwin,* 86 Ill. 479; *State* v. *Merchants' Mut. Ben. Soc.* 25 Al. L. J. 427.

The association in hand being an insurance company, is not within the provisions of R. S., c. 55, § 5; and the contract not being under seal, the party for whose benefit the promise was made might maintain an action upon it. *Hinkley* v. *Fowler,* 15 Maine, 285. The payment by the association to the defendant was not, therefore, voluntary and in the nature of a gift, but as the intended fulfilment of a contract of insurance, entered into between Bolton and the association for the benefit of his "widow;"

and if made to the defendant under the mistaken belief that she was his widow when she was not, the association might recover the money back. (*Townsend* v. *Crowdy*, 8 C. B. (N. S.) 98 E. C. L.) 477; *Kelly* v. *Solari*, 9 Mees. and W. 54; *Dails* v. *Lloyd*, 12 Q. B. (64 E. C. L.) 531; *Appleton Bank* v. *McGilvray*, 4 Gray, 518); and the defendant, not being the "widow" of Bolton, and having received money paid to her in the belief that she was the plaintiff, she cannot withhold it from her rightfully, and the law implies a promise on her part to pay it over to the rightful owner.

Plaintiff's exceptions. The plaintiff contended that the contracts of insurance between the associations and Bolton were in writing, and unambiguous; and that being in terms payable to Bolton's "widow," the plaintiff, who was his only legal widow, was entitled to the benefits.

But the presiding justice, entertaining the opinion that the extrinsic facts of Bolton's marriage and long cohabitation with the defendant, etc. developed such an ambiguity in the meaning of the word "widow" as used in the contract to designate the person entitled, as to authorize the jury to determine from all the testimony in the case, which of the two persons, plaintiff or defendant, was, in the contemplation of Bolton and the associations, intended by the designation of "widow." And he accordingly instructed them: "If you find from the evidence in the case that it was in the contemplation of James H. Bolton and either of the associations, that the benefit was to be for the defendant with whom he was then living as his wife, that she was to be treated and recognized as his widow, in case he died leaving her, and if it was in the contemplation of the parties that she was to be treated as the person designated as his widow after his death, it is competent for you to find for the defendant; and this, notwithstanding there was no written designation of the person to whom the money should be paid. That provision of the by-laws applies to a case where a member of the association designates some person other than the one named or designated by the association as the person to receive the benefit."

While the law will not admit parol testimony to contradict or otherwise vary written contracts, capable of a clear and intelli-

gible exposition from their terms, and thus make contracts for
parties other than those which they have made for themselves,
(*Haven* v. *Brown*, 7 Maine, 420 ; *Elder* v. *Elder*, 10 Maine, 80,)
it does admit, by necessity, sufficient extrinsic testimony to
apply them to the subjects and objects to which by their terms
they refer. *Eveleth* v. *Wilson*, 15 Maine, 109. And as a
general rule the law allows the expounder "the same light and
information that the parties had; to acquaint himself with the
persons and circumstances that are the subjects of the allusions
and statements in a written instrument; and is entitled to place
himself in the same situation as the parties who made the contract
to view the circumstances as they did, and so judge of the mean-
ing of the words and of the correct application of the language
professed to be described." *Shore* v. *Wilson*, 9 Cl. and Fin.
555, 569 ; *Hisckscocks* v. *Hisckscocks*, 5 Mees. & W. 363, 368 ;
*Emery* v. *Webster*, 42 Maine, 204. The object being to ascertain
not what the actual intention of the parties may have been as contra-
distinguished from what their words express, but what is the
meaning of the words they have used to express their intention,
*i. e.* to ascertain what they have said they mean. 1 Greenl. Ev.
§ 277, and cases in notes.

When a written instrument, free from doubt on its face, is thus
brought into contact with surrounding circumstances, a doubt
sometimes arises as to which of a plurality of persons or of
things, each answering the words of the writing, the parties in-
tended to designate. Such a contract is said to contain a latent
ambiguity. An ambiguity, because the word about which the
doubt arises has two meanings, and latent because it does not
appear upon reading the instrument, but is developed when it
comes to be applied to the persons or things to which it refers.
And being developed by evidence *dehors* other evidence of the
same character is admissible to solve the doubt. Add. Cont. 147.
As where a bequest was made to the "Am. Tract Society" and
extrinsic evidence disclosing two societies of the same name, other
parol evidence was admitted to show which was in the testator's
mind. *Bodman* v. *Am. Tract Soc.* 9 Allen, 447. So where a
sealed contract speaks of "David's deed," and it appeared by

·extrinsic evidence that the phrase applied equally well to a deed from, as well as to a deed to David, parol evidence was admitted ·to solve the ambiguity. *Patrick* v. *Grant*, 14 Maine, 233. The books contain very many illustrations of this well known principle, and the text books as well as the opinions of courts have ·adopted Lord Bacon's definition of it: "That which seems ·certain and without ambiguity for anything that appears upon ·the deed or instrument, but there is some collateral matter out-·side of the deed that breedeth ambiguity (Bac. Max. Reg. 23); :and illustrations are styled by him equivocations.

Before extrinsic evidence can be admitted, the word or phrase ·concerning which the doubt is raised must apply to each of the ¯two or more persons with legal certainty (1 Greenl. Ev. § 290, ·and cases there cited. *Cotton* v. *Smithwick*, 66 Maine, 367; *Pickering* v. *Pickering*, 50 N. H. 350; 1 Jarm. Wills, (R. and ˙T. ed.) 743, *429 and notes); or "equally well" (Stephens' Dig. ·Ev. § 8); or with "equal propriety or with legal certainty." 1 ˎ˙Redf. Wills, 560, § 7. The language must be interpreted ac-·cording to its proper acceptation, unless the context of the ˙instrument has otherwise defined it, and shows that it is susceptible of some more popular interpretation reconcilable with ·extraneous facts. 1 Jarm. Wills, (R. and T. ed.) 726, 730; Stephens' Dig. Ev. Art. 91, § 5.

Sir J. WIGRAM expresses the principle thus: "A testator is :always presumed to use the words in which he expresses himself :according to the strict and primary acceptation, unless from the ·context of the will it appears that he has used them in a different :sense." Prop. 1. There is no word or phrase in this contract of ˙insurance which shows that the parties to it intended the word ·"˙widow" to be used in any other than the legal sense, a woman whose husband is dead. It could not legally apply to the defend-·ant, in this state; for here there can be but one widow˙ of a ·deceased husband. To be sure, so far as the mere forms of law are concerned, she was married to Bolton and lived in adultery with him ever after until he died; but the formal marriage was absolutely void and would not save her children (if she had any) from illegitimacy, or confer upon her any derivative pauper set-

tlement. *Pittston* v. *Wiscasset*, 4 Maine, 293; *Howland* v. *Burlington*, 53 Maine, 54.

And "where there is nothing in the context of a will from which it is apparent that a testator has used the words in which he has expressed himself in any other than their strict and primary sense, and when his words so interpreted are sensible with reference to extrinsic circumstances, it is an inflexible rule of construction that the words of the will shall be interpreted in their strict primary sense, and in no other, although they may be capable of some popular or secondary interpretation and although the most conclusive evidence of intention to use them in such popular or secondary sense be tendered. Wig. Prop. II.

The foregoing rules find numerous illustrations in the construction of wills wherein legacies and devises are given to a "child" or "children" of some person named and such person has legitimate and illegitimate child or children, in which case the legitimate and not the illegitimate issue take. The word "children" it is said means *prima facie* legitimate children, as much so as if the word "legitimate" were written before it. Lord HATHERLEY, in *Dorin* v. *Dorin*, Eng. & Ir. Ap. Cas. 568; *Hill* v. *Crook*, L. R. 6 H. L. Cas. 268; *Gardner* v. *Heyer*, 2 Paige Ch. 10, 13; *Cromer* v. *Pickney*, 3 Paige Ch. 461, 475; *Collins* v. *Hoxie*, 9 Paige Ch. 81, 88. Where a testator has had two illegitimate children by a woman, married her, and the next day made his will leaving to her his property with "liberty to dispose of it amongst our children" by will, and should she make no will, expressed the desire "that the property at her death be equally divided between my children by her," and no children were born after the marriage, but he always treated the illegitimate children as his own; it was held that the illegitimate children took nothing. The Lord Ch. (CAINES,) said: "The will upon its face constrains no departure from what is the ordinary and *prima facie* legal meaning of the word 'children.' There is no case whatever which would enable us, in the interpretation of this will, to strain the word 'children' beyond its legal meaning." Lord HATHERLY said: "The only mode in which the word 'children' can be made to bear a different sense from that which is its first legal.

and natural sense, is this, that if you look to the outward circumstances as well as to the expressions contained in the will, and find that the outward circumstances of the case, combined with the expressions in the will, fail to give any adequate or intelligible sense to the will, then you have at once to arrive at the conclusion that the word 'children' has been used in some other or different sense; just as if the will had spoken of the 'children of my late brother' or the 'children of my late sister,' and if neither of those persons had been married and they were then dead, and there was no possibility that they should ever marry, you would be driven necessarily to the conclusion that the only children that could be meant must be those whom the law would not otherwise allow to fall into that class, viz : illigitimate children. I am at a loss to find in the outward circumstances anything beyond the fact that this gentleman had by this lady illegitimate children to whom he was very partial and whom he treated as his children; but the fact that he had such children by no means shows us that he intended to provide for them in his will. Your lordships may make your own conjecture upon the subject, but you are not at liberty, from anything that appears in his will, to infer that he meant anything other than that which the law says he has there done, namely, to make provision for the children of the marriage by the lady whom he had just married — that is for their children in the strict legal sense of the term. It is not because you find in the outward circumstances that there are some children whom you think he ought to have provided for, that the will must be taken to mean that they are to be provided for, when the words in the will can have full and complete effect given them if you interpret them in another and a legal sense without altering a single word. The testator, unfortunately if he intended to provide for their illegitimate children, has not used apt words in his will to give effect to that intention."

So in the older case of *Hare* v. *Lloyd*, 1 T. and R. 693, Lord ELDON said : "I have not the least doubt that this testator meant illegitimate children, but I am clearly of the opinion that there is not enough on the face of this will to authorize me to

carry that intention into effect." And in the still older case of *Cartwright* v. *Vandry*, 5 Ves. 534, Lord LOUGHBORROUGH said : "This is a very unfortunate case. I have no doubt of the intention ; but how can I possibly put upon the will the construction the plaintiff desires when there are lawful children ?" To the same purport is *Godfrey* v. *Davis*, 6 Ves. 48, commenting on which, Sir John STUART, V. C., said : "Take the words of Sir W. GRANT : 'No illegitimate child can claim under such a description,' that is, under the description of children, 'unless particularly pointed out by the testator, and manifestly and incontrovertibly intended, though in point of law not standing in that character,' why cannot an illegitimate so claim? Simply because, in the proper sense of the word 'child,' an illegitimate child is not a child. . . The law has long been established to this effect, and it is founded upon the principle which lies at the root of the construction of all instruments, viz : that the language must be interpreted in its ordinary sense, unless there be something in the context to show with certainty that another sense was intended." *Holt* v. *Sindrey*, L. R. 7 Eq. Cas. 175. See also the numerous cases cited and discussed in 2 Jarm. Wills (R. and T. ed.) c. 31, at the close of which the learned author draws the following conclusions :

1. That illegitimate children may take by any name or description which they have acquired by reputation at the time of making the will, but,

2. They are not objects of a gift to children or issue of any other degree, unless a distinct intention to that effect be manifest upon the face of the will ; and if, by possibility, legitimate children alone would have satisfied the terms of such gift, illegitimate children cannot take," etc. 821–2. See also, Stephens' Dig. Ev. 148 (h.). So "next of kin" *prima facie* means legitimate kindred. *In re Standley's Est.* 1 L. R. 5 Eq. 303.

The same principles apply to wife or widow. See *In re Davenport's Trust*, 1 Sm. and Gif. 126, which is quite fully stated in Wig. Wills, 76, in note.

"These rules may be safely applied, *mutato nomine*, to all other private instruments." 1 Greenl. Ev. § 287, and note 1.

And the general rule as laid down by Mr. Greenleaf, is : "The terms of every written instrument are to be understood in their plain, ordinary and popular sense, unless they have generally, in respect to the subject matter, as, by the known usage of trade, or the like, acquired a peculiar sense, distinct from the popular sense of the same words ; or unless the context evidently points out that, in the particular instance, and in order to effectuate the immediate intention of the parties, it should be understood in some other and peculiar sense." 1 Greenl. Ev. § 278. And "the same intention must be collected from the same words of a contract in writing, whether with or without a seal." LORD ELLENBOROUGH, in *Seddon* v. *Senate*, 13 East, 73. But even if this rule of construction governing wills be different from that of other instruments in respect to the question under examination, it is a sufficient answer that a contract of life insurance like those in question, while it is not a testament, it is in the nature of a testament ; and in construing it, the courts should treat it, so far as possible, as a will. *Masonic Ins. Co.* v. *Miller, supra.*

Our opinion, therefore, is, that assuming the plaintiff to be, what the jury found, the "widow" of Bolton, she is by the terms of the contracts entitled to the benefits sued for, since he could leave but one widow in this monogamic state ; and that the presiding justice should have given that instruction instead of the one hereinbefore recited.

We need not consider the other questions raised by the exceptions of the plaintiff.

*Plaintiff's exceptions sustained.*

APPLETON, C. J., BARROWS, PETERS, LIBBEY and SYMONDS, JJ., concurred.