KNIGHTS TEMPLARS & MASONIC MUT. AID ASS'N v. GREENE et al.

(Circuit Court, S. D. Ohio, W. D.   March 29, 1897.)

1. CONSTRUCTION OF LIFE INSURANCE POLICY—CONFLICT OF LAWS.
    Language in a life insurance policy designating the beneficiary must, subject to limitations of the statute or charter as to who may be designated, be regarded as the language of the insured alone, and is to be treated as of a testamentary character, and should receive as nearly as possible the same construction as if used in a will under the same circumstances. Therefore, under a policy, issued in Ohio, payable to the heirs of the insured, who was domiciled in New York, and all the possible objects of whose bounty lived there, the court must determine by the law of New York who are his heirs.

2. LIFE INSURANCE POLICY PAYABLE TO "HEIRS."
    Under the New York decisions the meaning and scope of the word "heirs," when used to designate those who are to take personal property, either in a will or in any document having the same effect as a testament, as in a life insurance policy, are to be determined from the context and the circumstances.

3. SAME.
    In New York the proceeds of a policy of life insurance payable to the "heirs" of the insured are to be distributed to those who would take his personal estate in case of intestacy, where it appears from the context and circumstances that such was his intention.

This suit was begun by the Knights Templars & Masonic Mutual Aid Association by filing its petition in the nature of an interpleader in the superior court of Cincinnati against Sarah L. Greene, the widow of John G. Greene, Mary Greene, the mother of John G. Greene, and John G. Greene's brothers and sisters.  The defendants removed the case to this court, where the pleadings were not reframed to conform to the equity practice of this court as they should have been.

The petition was filed to determine who among the defendants should be paid the amount of an insurance policy issued by the plaintiff association in the year 1879 on the life of John G. Greene for the sum of $5,000.  He died in 1894.  His widow made proof of loss, and claimed the entire amount of the policy as the beneficiary named therein.  The association paid her $1,000. The mother and the brothers and sisters of John G. Greene also made proof of loss, and claimed that the fund was due to them as beneficiaries named in the policy.

The Knights Templars & Masonic Mutual Aid Association was created under section 3630 of the Revised Statutes of Ohio.  That section provides that "a company or association may be organized to transact the business of life or accident insurance on the assessment plan, for the purpose of mutual protection and relief of its members and for the payment of stipulated sums of money to the families or heirs of the deceased members of such company or association."  Article 16 of the by-laws of the association provides as follows: "Every application for a certificate of membership shall be accompanied by a membership fee (see article 14), by an assessment for the payment of one death loss, and a certificate of medical examination as prescribed by the forms of this association.  If the application shall be rejected, all moneys paid shall be returned to the applicant, except so much as may be required to pay for the medical examination.  If the application is recommended by the medical

director, and approved by the president and secretary, a certificate shall be issued to the applicant. No certificate shall be in force until it is paid for. Certificates can only be made payable to the families or heirs of the member, or some one or more of them. (a) Any member may make any change in the beneficiaries under his certificate, from those named therein to any others of his family, or heirs, upon petition therefor on a form to be provided for that purpose, and paying therefor the sum of fifty cents. Such change shall be by indorsement on the original certificate, duly signed by the officers of the association and by the member."

The evidence shows that in 1879 Marsh & Fulton were the agents of the association in Cleveland, Ohio, and that Marsh visited the state of New York for the purpose of there soliciting applications for insurance; that the insured, John G. Greene, was a resident of Schenectady, N. Y., and that there the application for membership was signed, and with the necessary fee delivered, by him, on October 29, 1879, to Marsh; that Marsh sent the application and fee to the home office at Cincinnati for approval and acceptance; that the proper officers at Cincinnati accepted the application, and issued a policy or certificate of membership, and mailed the same on November 12, 1879, to Marsh & Fulton in Cleveland; that Greene received the policy at Schenectady; and that, as Marsh was in Schenectady at the time, he presumably delivered the policy to Greene at that place. Shortly after this, a regular agency of the association was established at Schenectady, from which Greene received all notices of assessment, and where he paid them. It further appears that the policy, as originally issued in 1879, was made payable to Sarah L. Greene, wife of John G. Greene. On November 23, 1889, John G. Greene wrote to the secretary of the association, inclosing his policy, as follows:

"Schenectady, N. Y., Nov. 23rd, 1889.

"Charles Brown, Esq., Sec. K. T. and M. M. A. A.—Dear Sir: Please find inclosed my policy No. 2,177. Please have it changed, and made payable to my heirs, executors, administrators, or assigns, and tell me how much the expense is, and I will send you a money order for the amt. Please have this attended at once, and return my policy.

"Yours, truly,                                                        J. G. Greene."

To which the secretary answered as follows:

"Cincinnati, November 26th, 1889.

"John G. Greene, Esq., Schenectady, N. Y.—Dear Sir: Your letter of the 23d inst., inclosing cert. and requesting change in beneficiary of same, to hand this morning. According to your direction we have made indorsement upon your certificate, making the beneficiary payable to your heirs. It could not be made payable to yourself, your estate, assigns, or administrators, or executors, as this, according to the laws of Ohio, would make it void. When you have signed this indorsement, send your certificate to us with the sum of 50 cts., when the change will be recorded, and your certificate of membership returned to you.

"Very respectfully, yours,                                  Chas. Brown, Sec."

To which Greene answered:

"Schenectady, N. Y., Nov. 28, 1889.

"Mr. Chas. Brown, Esq.—Dear Sir: Please find inclosed 50 cts. P. O. stamps for amt. asked for.

"Yours, truly,                                                        J. G. Greene."

On receipt of which the secretary replied as follows:

"Cincinnati, Nov. 30th, '89.

"John G. Greene, Esq., Schenectady, N. Y.—Dear Sir: Having recorded change in beneficiary of your certificate as directed by you, we herewith return your certificate.

"Very respectfully, yours,                                  Chas. Brown, Sec."

Subsequent to the indorsement of the change of the beneficiary on the original policy, Greene lost his policy, and thereupon a new and duplicate policy was issued to him, as follows:

"Knights Templars and Masonic Mutual Aid Association.

"The Knights Templars and Masonic Mutual Aid Association, in consideration of the representations made to it in the application for this certificate and the sum of sixteen dollars to it paid by John G. Greene, of Schenectady, N. Y., and such further sum or sums, in assessments to be made and paid as provided in the by-laws of the association, hereby promises and agrees with him to well and truly pay to the heirs of the said John G. Greene the sum of five thousand dollars, or such proportion thereof as is provided for in said by-laws. Payment to be made at the office of the association in the city of Cincinnati, O., within sixty·days after due notice and satisfactory proof of the death (during the continuance of this contract) of the said John G. Greene. * * *

"In witness whereof, the said Knights Templars and Masonic Mutual Aid Association has caused these presents to be signed by its president and secretary, and its seal to be attached hereto, in the city of Cincinnati, state of Ohio, this 11th day of November, A. D. 1879.

"E. T. Carson, President.

"Chas. Brown, Secretary."

There are eight conditions printed on the face of the policy, of which the fifth condition is as follows: "All receipts, to be binding on the association, shall be signed by the president, vice president, or secretary, and if any assessment shall not be paid within 10 days after notice, as provided in the by-laws, at the office of the association in the city of Cincinnati, Ohio (unless otherwise expressly agreed in writing), or to the collectors when they produce receipts, properly signed, then and in every such case this association shall not be liable for the payment of said sum, nor any part thereof, and this certificate shall be null, void, and of no effect." The seventh condition is: "Agents of the association are not authorized to make, alter, or discharge contracts, or waive forfeitures. Inasmuch as only the officers at the home office of the association, in the city of Cincinnati, have authority to determine whether or not a certificate shall issue on any application, and as they act on the written statements and representations hereinabove referred to, it is expressly understood and agreed that no statements, representations, or information made or given by or to the person soliciting or taking the application for this certificate, or to any other person, shall be binding on the association, or in any manner affect its rights, unless such statements, representations, or information be reduced to writing, and presented to the officers of the association, at the home office, in the application referred to." The eighth condition is: "The by-laws of the association constitute a part of this certificate."

Article 25 of the by-laws of the association provided for an annual meeting in the state of New York, as follows: "A stated annual meeting of the members of this association shall be held within the county, in the state of New York, in which the principal office of the association in said state is located, on the second Monday in February in each year. Notice of every such meeting shall be given to each director, member, and policy holder, not less than five days before the meeting, by notice, by mail, or by advertisements inserted in two newspapers of general circulation,—one published in the city of Cincinnati, the other in said county in the state of New York. At such meeting a full and specific report of all the association's receipts and expenditures of the preceding year shall be submitted, together with a report of the proceedings of the members' annual meeting held at the home office. No other business shall be transacted at said meeting."

The evidence shows that John G. Greene died insolvent, and that his widow received or is likely to receive nothing from the estate except the widow's allowance of household furniture under the New York statute and a possible dower interest in one-third of some wild land in South Carolina, which is worth little, if anything. Greene's brothers and sisters numbered six, and all but two lived with his mother at Gloversville, N. Y. The remaining two lived in California. Greene, during his life, contributed to the support of his mother. Greene had no children, though he and his wife had been married some 20 years. At the time of his death he was about 58 years of age, and

his wife was about 49. He dabbled in patents, and has engaged in other speculative enterprises. He had given to his wife a house in Schenectady in which they lived, and upon which there were two mortgages, aggregating about $3,700 at the time of his death. He owned real estate in New York, but it was mortgaged to its full value, and, when sold, left nothing over the amount due on the mortgage. He made no will, though he executed a paper on November 10, 1892, in the form of a will, but not legally witnessed, in which he left all his property to his beloved wife, if she survived him; if not, then to his mother, and, in case of her dying before him, to his unmarried sisters.

T. M. Hinkle, for plaintiff.

C. D. Robertson and M. L. Buchwalter, for the widow of John G. Greene.

N. J. Davidson, for the mother, brothers and sisters of John G. Greene.

TAFT, Circuit Judge (after stating the facts). It is contended on behalf of the widow of John G. Greene, the insured, that the word "heirs" should be construed according to the laws of Ohio. If so, it is conceded that, as the insured left no children, she would take the entire fund, whether the word "heirs" is to be construed strictly as meaning those who at his death would inherit real estate from the insured, or is to be taken as meaning those to whom personal property of the insured would be distributed if he died intestate. The administrator of Mary Greene, the mother of the insured (she having died since the beginning of this suit), and the brothers and sisters of the insured, contend that the word "heirs" is to be construed under the law of New York, and that, whether it is to be interpreted technically as those inheriting real estate, or only as next of kin, in either case, by the New York law, the widow, Sarah L. Greene, takes nothing. It is contended by the association (which has paid $1,000 to the widow) and by the widow that, even if the New York law is to control the meaning of "heirs," the court must construe the word in accordance with that law to mean those to whom the proceeds of the policy would have gone had it been part of his estate and he had died intestate, and in that case by the intestate statutes of New York the widow would receive a moiety of the proceeds of the policy.

The application was made and delivered to the agent of the company in New York, and the certificate or policy was delivered by an agent of the company in New York to the insured. All payments were made in New York by the insured to an agent of the company, both those accompanying the original application and all subsequent ones. These circumstances, under the decision in Assurance Soc. v. Clements, 140 U. S. 226, 11 Sup. Ct. 822, might seem to justify the conclusion that the contract, having been made in New York, should be construed by the New York law, and thus that the word "heirs," within the intention of the parties, should be construed to be "heirs" as interpreted by the New York law, rather than as interpreted by that of Ohio. I do not propose, however, to rest the decision in this case on its likeness to the case of Assurance Soc. v. Clements. There are some additional circumstances in this case which may, perhaps, distinguish this case from that. The policy

was to be approved and issued in Ohio. The policy was to be payable there. In cases where both parties are interested in the construction of the insurance contracts, these circumstances are sometimes regarded as important.

But I do not think this a case for construing the terms of a contract to reach the common intent of two parties, and it does not seem to me that the same rules apply. What we are construing here is language of the insured designating the beneficiary of his bounty after his death. By the by-laws of the association he was given power to change this designation at any time before his death. The association reserved no right or power to object to any designation or change of designation, provided the beneficiary named was within those classes of persons to whom, by statute, charter, and its own by-laws, the association was permitted to pay policies. Now, it must be conceded that, as those classes are limited by the law of Ohio, the terms used to describe them in the law must be construed according to the law of the state. Therefore the association had no power to agree to pay policies to any person not a member of the family of the insured or not an heir of the insured, as "family" and "heir" are defined by the law of Ohio. Within these classes, however, the association was entirely indifferent who the designated beneficiary might be. It is conceded that each of the claimants at the bar is within the requirement of the statute of Ohio. Subject to the limitation of the statute, the construction of the language of the designation becomes solely a matter of determining the intent of the insured. In other words, the language is to be treated as of a testamentary character, and is to receive, as nearly as possible, the same construction as if used in a will under the same circumstances. Bolton v. Bolton, 73 Me. 299; Duvall v. Goodson, 79 Ky. 224–228; Mutual Ass'n v. Montgomery, 70 Mich. 587, 38 N. W. 588; Silvers v. Association, 94 Mich. 39, 53 N. W. 935; Chartrand v. Brace, 16 Colo. 19, 26 Pac. 152; Phillips v. Carpenter (Iowa) 44 N. W. 898.

This designation was made in New York, by one domiciled in New York, for distribution to his family, most of whom lived in New York. If we were construing this language as a clause in a will, whether the money bequeathed were payable in New York or Ohio, there can be no doubt that the word "heirs" would be construed under the New York law, because that of the domicile of the testator. Harrison v. Nixon, 9 Pet. 483; Anstruther v. Chalmer, 2 Sim. 1; Yates v. Thompson, 3 Clark & F. 544; Enohin v. Wylie, 10 H. L. Cas. 1; Wilson's Trusts (Shaw v. Gould) L. R. 3 H. L. 55; Parsons v. Lyman, 20 N. Y. 103; Freeman's Appeal, 68 Pa. St. 151. Following this testamentary rule of construction, I have little difficulty in concluding that Greene intended that the language he used should be construed by the law of New York. Indeed, without the aid of authority, I should reach the same decision. Greene lived in New York, and all the possible objects of his bounty lived there. Is it reasonable to suppose that he would use language to describe them, intending it to be interpreted by the law of some other state? I cannot think so. Nor is there anything in the circumstances of his change of the beneficiary to lead to a different result. If the

correspondence between the insured and the association at the time the beneficiary was changed is competent, it shows that he wished the proceeds of the policy to go to his estate, for he used the words "heirs, administrators, executors, and assigns." To this the association responded that the law of its creation forbade a designation to his "estate," but that he might designate his "heirs," which he did. This shows that his purpose was to leave it to those to whom it would go, were it part of his estate and he were to die intestate, and he used the word "heirs" as most nearly accomplishing that purpose. Had he been permitted to designate his estate as the payee, certainly the proceeds of the policy would have been distributed under the New York law. May we not presume that, with the same purpose in view, he intended that the designation he was permitted to make should receive a New York construction? The mere fact that he was cautioned that the Ohio law did not permit him to direct payment to his estate does not, it seems to me, show that he intended the words he used to receive an Ohio construction. He knew that the association did business outside of the state of Ohio. He knew that, so large was the number of New York certificate holders, the annual meeting of the association was held in New York. Was it not most natural for him to think that, so long as he designated persons within the limitation permitted by the Ohio law, the particular individuals named by him should be determined by giving to his language the meaning it would have at his home, where the money was ultimately to come and where the beneficiaries lived? We can be certain that Greene regarded the proceeds of this policy as part of his estate which he was leaving to be distributed at his death; and we may be sure that he did not distinguish between language used in the designation and that which he would have used in a will concerning his personal estate.

In Mayo v. Assurance Soc., 71 Miss. 590, 15 South. 791, it was held that the proceeds of a policy of life insurance issued in New York, and payable to the heirs of the insured, who was domiciled in Virginia, were to be distributed under the laws of the latter state. In Association v. Jones, 154 Pa. St. 107, 26 Atl. 255, an association of Ohio, organized under exactly the same law as the complainant, issued a policy payable to the legal heirs of the insured, who was domiciled in Pennsylvania. It was held that the court must determine who the legal heirs of the insured were by the law of his domicile, to wit, Pennsylvania. The court said (page 108, 154 Pa. St., and page 255, 26 Atl.):

"This contract is made with William D. Jones, of Philadelphia, and it fixes his domicile, and promises to pay the fund to his legal heirs. His domicile being thus here, a promise to pay to his legal heirs must be such as are determined by the intestate laws of such domicile."

In Association v. Jones, 154 Pa. St. 99, 26 Atl. 253, a policy was payable "to the devisees, or, if no will, to the heirs, of the said William Jones." The association was organized under the laws of Illinois. It was held that there was no disposition of the proceeds of the policy by the will. It was held that the word "heirs" meant those distributees to whom personal property of the insured

would go if he died intestate.   It was contended that the words should be given effect according to the law of Illinois, and as, by those laws, the husband's personal property would go to the widow in case of his intestacy, she was entitled to the whole fund.   The court held that, as the policy was issued to Jones as a citizen of Pennsylvania, the promise to pay to his heirs must be treated as a promise to pay according to the intestate law of his domicile, and that it was a case for the application of the common-law rule "that personal property has no situs, but follows the person of the owner, and is distributed according to the intestate laws of such owner's domicile."

There are other cases in which the same result was reached, though no question seems to have been raised on the point by counsel or considered by the court.   Gauch v. Insurance Co., 88 Ill. 251; Britton v. Supreme Council, 46 N. J. Eq. 102, 18 Atl. 675.   It may be noted, in connection with the two Pennsylvania cases just cited, that the policy in this case expressly insures the life of John G. Greene, of Schenectady, N. Y.   I conclude, both on reason and authority, that the word "heirs," as used in the certificate or policy in the case at bar, is to be construed according to New York law.

And what does the word "heirs" mean, according to the New York law, used in a policy of life insurance?   It is well settled in many states that where "heirs" is used, in a will or other document having a testamentary effect, to designate persons who are to receive personal property, it shall be held to mean those persons to whom the personalty of the giver would be distributed if he were to die intestate.   Of course, as already said, technically it means those who would inherit the giver's real estate in case of his intestacy.   But courts recognize that the word is given in common parlance—"ut loquitur vulgus"—a much wider meaning, and includes all those who would succeed, under the intestate laws of the state, to the enjoyment of the property in question.   Association v. Jones, supra; McGill's Appeal, 61 Pa. St. 46; Eby's Appeal, 84 Pa. St. 241; Sweet v. Dutton, 109 Mass. 589; Welsh v. Crater, 32 N. J. Eq. 177; Freeman v. Knight, 2 Ired. Eq. 72; Croom v. Herring, 4 Hawks, 393; Corbitt v. Corbitt, 1 Jones, Eq. 114; Henderson v. Henderson, 1 Jones (N. C.) 221; Alexander v. Wallace, 8 Lea, 569; Collier v. Collier's Ex'rs, 3 Ohio St. 369; Doody v. Higgins, 2 Kay & J. 729.

In the case of Tillman v. Davis, 95 N. Y. 17, a testatrix directed that the residuum of her estate should be divided into seven equal parts, and she devised and bequeathed the parts to seven persons (naming them), respectively; "the heirs of any or either of the foregoing persons who may die before my said husband to take the share which the person or persons so dying would have taken if living."   It was held by the court of appeals that "heirs" here meant next of kin, but that it did not include the widow.   The reasoning of Judge Earl, who delivered the opinion of the court, is avowedly at variance with that of the authorities cited above, but there are certain features of the case which distinguish it from that at bar. One is that the testatrix was using the word "heirs" to describe, not

her own next of kin, but those of one of her beneficiaries, and hence the court might justly say, as it did: "It is presumable that she was attached to the legatees named in those clauses by ties of affection or blood, and hence that she desired that the persons of the same blood, who might also be relatives of her blood, should succeed to the property,"—and thus intended to exclude mere connections by marriage of the beneficiaries of her bounty. Again, the court points .out that in this case, when the testatrix was writing her will, she was dealing with both real and personal property, "and she undoubtedly used the word 'heirs' to designate blood relatives, and in the same sense, whether applied to real or to personal estate." Still, in spite of these distinctions, it must be conceded that, but for the later New York decisions, the broad language of this opinion 'in other parts would fix the law of New York as excluding from the meaning of the word "heirs," used to describe legatees of personal property, the widow of the testator.

There are several earlier cases in New York which are relied on by counsel for the mother's administrator and the brothers and sisters. In Keteltas v. Keteltas, 72 N. Y. 312, it was held that a residuary bequest to his "next of kin according to the statute of the state of New York concerning the distribution of personal estates of intestates," in a will made before the testator was married, did not include his widow. In Luce v. Dunham, 69 N. Y. 37, a testator gave all his real estate and $100,000 to his wife, and then gave the residuum of his estate to be divided among his heirs and next of kin as provided by statute in cases of intestacy; and it was held that the word "heirs" was used with technical correctness, having regard to a possible acquisition of real estate before his death, and that the words "next of kin" did not include the widow. In Murdock v. Ward, 67 N. Y. 387, the testator bequeathed the residuum of his estate to his sons when they became of age, and, in case they did not live to take, then "to be equally divided among and paid to the persons entitled thereto as their or either of their next of kin according to the laws of the state of New York, and as if the same were personal property and they or either of them had died intestate." It was held that under this the widow of a deceased son could not take any part of his share. The effect of these earlier decisions is to limit the meaning of "next of kin" to blood relations, and not to allow it to be enlarged to include the widow by accompanying directions to follow the statute of distribution in case of intestacy; but they none of them deal with the meaning of the word "heirs," when accompanied by such directions, and used to indicate legatees of personal property. Still, the conclusion in Tillman v. Davis is based on these earlier cases, and they certainly indicate a tendency on the part of the New York court of appeals at that time to avoid giving the statute of intestacy full effect when there are any limiting words.

The first indication of a disposition to relax the strict rule adopted in the prior cases is found in Woodward v. James, 115 N. Y. 346, 22 N. E. 150. There the testator left a brother; two half-sisters; nine nephews and nieces, children of a deceased brother, half-

brother, and half-sister; and plaintiff, who was a grandchild of a deceased brother. After the death of his wife, the testator gave the residuum to "his legal heirs." It was held that these words meant those who would take in case of intestacy, and in the proportions described, and that the remainder-men took per stirpes and not per capita, and that, as under the New York statute of distributions representation goes no further than brothers' and sisters' children, and the rule of intestacy applied to the quantity of interest to be taken, the plaintiff had no interest in the estate. This case certainly gave full effect to the statute of distribution, though the only words used were "legal heirs." The next case in New York was Lawton v. Corlies, 127 N. Y. 100, 27 N. E. 847. In this case the testator had nothing but personalty when he made his will, and left nothing else on his death. His will directed that his estate should be divided among his "heirs at law, in accordance with the laws of the state of New York applicable to persons who die intestate." It was held that the words "heirs at law" were not used in their strict legal sense, but to indicate persons who would succeed to the property in case of intestacy; that it was the testator's intention that his real estate, if any, should be divided according to the statute of descents, and his personal property according to the statute of distributions; and, therefore, that the grand nieces and nephews were not entitled to share in the distribution of the estate. The court say (page 105, 127 N. Y., and page 848, 27 N. E.):

"While technical words in a will, when uncontrolled by the context, are presumed to have been used in their technical sense, still the context may overcome the presumption, when it appears thereby and from extraneous facts of the kind already alluded to, that the testator used the words in their common and popular sense. The context in the case in hand shows that the estate was to be divided in accordance with the laws of the state of New York applicable to persons who die intestate. The use of the word 'heirs at law,' in such a connection, indicates, as we think, the 'legal heirs,' in the sense of the persons who would legally succeed to the property in case of intestacy according to its nature or quality: the heirs at law taking the realty and the next of kin the personalty. The cardinal idea seems to be that the division should be made in accordance with the statute in case of intestacy."

The court distinguishes Luce v. Dunham, Keteltas v. Keteltas, and Tillman v. Davis, and then uses this language:

"All these cases recognize the principle that, where the context of the will shows that the testator used the word 'heirs,' or the expression 'heirs at law' or 'next of kin,' in a sense other than the primary legal sense, the actual intention must prevail over the use of technical language. In every case, the aim was to get at the intention, and, when that was found, not by conjecture, but by careful study of all the provisions of the will, it was blindly followed. So in this case, after giving due force to the term 'heirs at law,' we think that the testator meant, as he said, that his property should be divided according to law, the same as if he had not made a will."

The last case in New York, and the one more nearly like the one at bar, is that of Walsh v. Walsh, 143 N. Y. 662, 39 N. E. 21, where the court of appeals agreed to affirm the judgment of the supreme court in general term on the opinion of that court. The

opinion of the general term is found in 66 Hun, 297, 20 N. Y. Supp. 933. In that case, a by-law of a mutual aid society, like the complainant at bar, provided, in respect to the proceeds of the policy of a deceased member, that "in case of a failure of, or imperfect, designation, then the amount shall be paid to the legal heirs of the deceased member." The question was whether the widow could take under this provision. The court held, following Lawton v. Corlies and Woodward v. James, that "legal heirs" included all those who would take such property in case of intestacy, and that, considering the purposes of the association, they could not be limited in meaning to "next of kin."

From this review of the New York cases, it is apparent that, whatever some of the language of the earlier cases, the meaning and scope of the word "heirs," when used to designate those who are to take personal property, either in a will or in any document having the same effect as a testament, are to be determined from the context and the circumstances. In the case at bar those guides leave no doubt in my mind that it was the intention of the insured to secure by his designation that distribution of the proceeds of his policy which would take place in case of his intestacy, were it part of his estate. The circumstances of the change in the designation, instead of showing a desire to exclude the widow from sharing in the proceeds of the policy, confirm me in the view that he wished her, if living, to take under the statute of distribution in New York, rather than by special designation. His will (so called) is not competent evidence, but the correspondence between him and the association in regard to the designation seems to me to be clearly so. It is the correspondence which really contains the designation. What he wished was to make the policy part of his estate, probably for his own use during life, and, failing that, he used the word which came nearest to his purpose, and which would, as he supposed, make the proceeds take the course after his death which they would have taken were they his during his life.

With this construction, we must refer to the statute of distribution of New York to determine how the money in this case must go. Paragraph 2, § 75, tit. 3, of chapter 6 of the statutes of New York on wills and decedents' estates (4 Rev. St. [8th Ed.] p. 2565) provides as follows:

"That if the deceased leave no children the widow shall take a moiety of the personal estate."

Paragraph 6 provides:

"If the deceased shall leave no children and no representatives of them, and no father and shall leave a widow and a mother, the moiety not distributed to the widow shall be distributed in equal shares to his mother, and brothers and sisters, or the representatives of such brothers and sisters."

The decree of the court must be, therefore, an order distributing the proceeds of the policy, one-half to the widow, Sarah L. Greene, and one-half to be equally divided between the administrator of Mary Greene, the mother, and the brothers and sisters of John L. Greene, including, as one of the equally sharing distributees, the

son of his deceased sister. The widow, Sarah L. Greene, will, of course, be charged with the $1,000 already paid her by the complainant. The costs will be paid out of the fund.